Fawcett, Isham & Co., *v.* Osborn, Adams & Co.

# FAWCETT, ISHAM & CO.

## *v.*

# OSBORN, ADAMS & CO.

1. SALE OF PERSONAL PROPERTY — *where the vendor has no title — and herein, where the vendor has acquired title fraudulently.* It is a general rule of law that no man can, by his sale, transfer to another the right of ownership in a thing wherein he himself had not the right of property.

2. There is an exception to this rule, for the sake of sustaining the currency, in the instances of cash, bank bills, checks and notes payable to bearer or transferable on delivery, in the ordinary course of business, to a person taking it *bona fide*, and paying value for it.

3. Another exception obtains in England, in the case of title acquired by sale in *market overt* of stolen property.

4. But we have no *Saxon* institution of *markets overt* in this country, which controls or interferes with the application of the common law. A purchase of goods, in the ordinary way, in a commercial city, in open market, can have no other effect here than mere private sales in England. So that any sale of stolen goods does not divest the title of the owner.

5. Possession of personal property is one *indicium* of ownership, and is *prima facie* evidence of title in the thing, and when to that is added proof of an actual sale and delivery to him having such possession, by the real owner, though by fraudulent pretenses, a subsequent sale by such purchaser to a *bona fide* purchaser, without notice of any fraud in the alleged sale and delivery to his vendor, has been held to confer title upon such subsequent *bona fide* purchaser.

6. And effect would be given to such a sale as against the true owner, when the latter not only suffers the vendor to have the possession, but also delivers to him documentary evidence, and *thus*, by the possession and the documents with which the real owner has endowed him, enables him to hold himself out to the world as the true owner. If, in such case, any loss happens, he who has thus clothed the vendor with the power to deceive, ought to bear it.

7. But a mere naked possession in the vendor will not prevail against the true owner, who may follow his property and reclaim it wherever found.

8. There being, upon the sale of personal property, an implied warranty of title, the vendee has his action against the vendor if his title proves deficient. The buyer must then take care that he is not deceived by dealing for a pretended title,

or that his vendor is able to respond in damages for any loss which may happen to the vendee.

9. So, as this case, where F., I. & Co., merchants and dealers in leather in the city of New York, furnished hides to W. H. & F. S., tanners in the country, to be by them manufactured into leather, and returned to the former firm, under a contract of such character that the ownership in the hides and leather remained all the while in the parties furnishing the hides, one of the firm of tanners, while the leather was in their possession, solely for the purpose indicated, shipped away a quantity of it in a clandestine manner, without the knowledge or consent of the owners, to the city of Chicago, and there, through an agent, sold it in the ordinary way of business, in open market, at a fair price, to parties who had no knowledge of the manner in which the vendor acquired the possession, or notice of the rights or claim of the owners, it was *held*, no title passed to the vendees as against the real owners.

10. PARTNERSHIP — *what constitutes, in view of the rights of purchasers.* Where a party furnished hides to another to be manufactured into leather, and returned to the party furnishing the hides, to be sold by them, for which services the tanner was to receive a stipulated price per pound, it being also agreed that the profit and loss on the leather, to be determined in the mode stipulated, should be divided between the parties, — *Held*, that no such partnership in the leather was thereby created between the party furnishing the hides and the party manufacturing the hides into leather, as to authorize the latter, while the leather was in his possession solely for the purposes indicated in the contract, to make sale of it, or to protect a purchaser from him, as against the other party.

WRIT OF ERROR to the Superior Court of Chicago.

The plaintiffs, Fawcett, Isham & Co., being copartners and dealers in leather in the city of New York, entered into a contract, in writing, with Walter H. Stevens and Fletcher Stevens, who were engaged in the business of tanning at Stevensville, Sullivan county, New York, under the firm name of W. H. & F. Stevens, as follows:

It is this day agreed between Fawcett, Isham & Co., of the city of New York, and W. H. & F. Stevens, of Stevensville, Sullivan county, New York, that said Fawcett, Isham & Co. shall send to said W. H. & F. Stevens what hides they may require for the purpose of being tanned and manufactured into sole leather in their tannery at said Stevensville, for three years from this date; the number of hides is not to be less than fifteen thousand each year, nor more than twenty-five thousand each year, unless both parties, in writing, should hereafter agree to increase or lessen the amount. W. H. & F. Stevens,

during the said three years, are not to tan hides for any other parties. W. H. & F. Stevens agree to receive the hides at a dock in the city of New York, to pay all expense of transportation to their tannery, to tan and manufacture them into sole leather, in a good and workmanlike manner, to make leather of a quality and of gain in weight equal to that made by all first class tanners, and to return the leather so tanned to said Fawcett, Isham & Co., at a dock in the city of New York, clear of all expenses of transportation. For all which services Fawcett, Isham & Co. agree to pay to said W. H. & F. Stevens five cents per pound for each pound of leather so tanned and returned, which shall be due at the average time of the receipt of each invoice. It is further agreed that the profit or loss on all the leather manufactured under this contract shall be equally divided between both parties, which shall be determined as follows : After said Fawcett, Isham & Co. shall have sold the leather manufactured from each invoice of hides, they shall deduct from the gross amount of such sales the cost of the hides, with five per cent. added thereto, the amount paid or payable for tanning, all costs and charges of cartage on both hides and leather, inspection, exchange and interest on all these amounts, till the sales are due, by average; also six per cent. on the gross amount of the sales, and the balance or difference, being gain or loss, shall be equally divided between said Fawcett, Isham & Co. and said W. H. & F. Stevens. Fawcett, Isham & Co. are to take the sole risk of all sales made on credit. W. H. & F. Stevens agree to return the leather from each invoice of hides within eight months from the time they leave the city of New York, provided that each invoice shall not exceed one thousand sides; in such case, they agree to return them in a fair proportionate time ; and, provided further, that, in case hides are sent faster than they can be worked, an allowance shall be made in proportion. Fawcett, Isham & Co. shall procure what insurance against fire they may think necessary, one-half of the cost of which shall be paid by W. H. & F. Stevens.

New York, August 7th, 1855.

(Signed),          W. H. & F. STEVENS,
                           FAWCETT, ISHAM & CO."

In pursuance of the terms of this contract, Fawcett, Isham & Co. furnished the Stevens' up to the 16th of September, 1856, with hides to be tanned, to the number of 18,000 and more, of which they received back from the Stevens' about 16,000 sides, equal to 8,000 hides. In the month of September, 1856, Fletcher Stevens, one of the firm of W. H. & F. Stevens, shipped in a clandestine manner, without the knowledge or consent of Fawcett, Isham & Co., a large quantity of leather manufactured from the hides thus furnished by the latter firm, to places other than the city of New York. During the movement of the leather, Stevens assumed the name of " F. Stafford," and had in his employment, in connection therewith, a man by the name of William H. Stanton, who, at the suggestion of Stevens, assumed the name of " L. L. Stratton," for the purpose, as declared by Stevens, of preventing Fawcett, Isham & Co. from getting upon his track and following him to intercept his plans in making sale of the leather.

Two thousand sides of this leather were shipped in 1857 by Stevens to Chicago, consigned to himself by his assumed name, " F. Stafford," and, on their arrival, were taken possession of by Stanton, acting under his assumed name of " Stratton," who had been sent there by Stevens for that purpose, and to dispose of the leather. Stanton, upon his arriving at Chicago, made the acquaintance of one Rose, until then an entire stranger to him, by whom he was introduced by his assumed name to Osborn, Adams & Co., of Chicago, Rose representing to them that the owners of the leather were large manufacturers and dealers in leather in Sullivan county, New York, well known to him, and had sent a quantity of leather to Chicago for sale. Osborn, Adams & Co. thereupon purchased from Stanton the two thousand sides of leather shipped to that city in the manner mentioned, and made payment therefor, having no knowledge, at the time, of the manner in which Stevens or his agent became possessed of the leather, or notice of any claim thereto on the part of Fawcett, Isham & Co., and paying a fair price for the property.

Fawcett, Isham & Co., traced the leather into the hands of

the purchasers, and demanded the possession of it, which, being refused, they commenced their action of trover and conversion against Osborn, Adams & Co., to recover its value. The defendants pleaded the general issue, and a trial was had, during the progress of which the facts were developed substantially as stated. Upon the testimony being closed, the plaintiff asked several instructions to be given to the jury, some of which were refused altogether, and others given in a modified form, and several were given by the court upon its own motion. These instructions simply present the questions which are clearly elucidated in the opinion of the court, and need not be given here.

The jury returned a verdict for the defendants. A new trial was refused, and judgment entered against the plaintiffs for costs. They thereupon sued out this writ of error. The principal question presented upon the record is, whether Osborn, Adams & Co., by their purchase from the agent of Stevens, acquired title as against the plaintiffs, assuming that they were the true owners. The question, which was in a partial sense before this court in the case of *Stevens* v. *Fawcett et al.*, 24 Ill. 483, whether the plaintiffs and the Stevens' were partners under their contract in relation to the leather, so as to enable Stevens to pass the title to his vendees, the defendants, is also presented.

Messrs. McALLISTER, JEWETT & JACKSON, for the plaintiffs in error, presented the following points and authorities upon the main question:

It is a fundamental principle of the law of personal property, that no man can be divested of it without his own consent, or by operation of law. *Jennings* v. *Gage*, 13 Ill. 610; *Saltus* v. *Everett*, 20 Wend. 275. No one can transfer to another a better title than he has himself; and a sale *ex vi termini*, imports nothing more than that the *bona fide* purchaser succeeds to the rights of his vendor. The only exception to this rule, in the ancient English jurisprudence, was that of sales in *market overt*, which has no application in this country. 2 Kent's Com. 324, and notes; *Saltus* v. *Everett*, supra.

True, "if the real owner of goods suffer another to have possession of his property, and of those *documents* which are

the *indicia* of property, then perhaps a sale by such a person would bind the true owner." Chitty on Con. 384.

But, here, the plaintiffs did not deliver the hides to W. H. & F. Stevens, with the intention of selling to them. They were mere bailees of the hides as well as the leather, and the *document*—that is, the contract—which characterized their possession, was no *index* of ownership or property; because, by it they were merely to perform labor upon the hides, and then return them to plaintiffs. There were no *indicia* of property in this, any more than if "A." leaves his cloth with "B.," a tailor, to be made into clothes, or his watch with " C." to have it cleaned. As to what constitutes *indicia* of property, see the learned and elegant opinion of Senator VERPLANCK, in the case of *Saltus* v. *Everett*, 20 Wend. 275, above cited; *Easton* v. *Worthington*, 5 Serg. & R. 130; *Lecky* v. *McDermott*, 8 Serg. & R. 500; *Roland* v. *Grundy*, 5 Ohio, 202; *Doty* v. *Hawkins*, 6 N. Hamp. 247; *Hyde* v. *Noble*, 13 id. 494; 26 Alabama, 576; *Kinder* v. *Shaw*, 2 Mass. 398; *Brown* v. *Peabody*, 3 Kernan, 121.

Even if the plaintiffs had permitted the Stevens' to exhibit appearances of authority to sell the leather manufactured by them from the plaintiffs' hides, by which others might be misled into dealing with them contrary to the actual character of their relations, still it would devolve upon the defendants to show that they had knowledge of such appearances prior to their purchase, and that they actually or presumptively relied upon them. *Rawson* v. *Curtiss*, 19 Ill. 456.

The same principle would apply if the defendants sought to uphold the sale on the ground that the plaintiffs allowed the Stevens' to hold themselves out as complete partners with them in reference to the leather. *Dickinson* v. *Valpey*, 10 Barn. & Cres. 140, opinion of PARKE, J.; *Benedict* v. *Davies*, 2 McLean, 347; *Shott* v. *Streatfield*, Moody & Rob. 9; *Alderson* v. *Popes*, 1 Camp. 404; *Carter* v. *Walley*, 1 Barn. & Adol. 11; *Wright* v. *Powell*, 8 Ala. 560; *Markham* v. *Jones*, 7 B. Monroe, 456; *Waite* v. *Brewster*, 31 Verm. 516; *Hicks* v. *Cram*, 17 Verm. 454; *Kelly* v. *Hurlburt*, 5 Cow. 534.

The fact that the defendants purchased for a full consideration, and without knowledge of the agreement between the plaintiffs and the Stevens', or even the absence of any circumstances to put a prudent man upon inquiry, and that they purchased in *open market*, will not avail them as against the true owner. We have no *markets overt* in this country. *Newkirk* v. *Dalton*, 17 Ill. 413; *Hoffman* v. *Carow*, 22 Wend. 285, and cases cited.

The taking and removal of the leather in question by Fletcher Stevens, under the circumstances detailed in the evidence, was felonious, and therefore no title could be acquired by a *bona fide* purchaser from him. *Commonwealth* v. *Kingsbury*, 5 Mass. 106; *Mowry* v. *Walsh*, 8 Cow. 238.

Mr. EDWARD S. ISHAM, on the same side.

It is settled in the case of *Stevens* v. *Fawcett et al.*, 24 Ill. 483, that the property in the leather in question, as between the Stevens' and *Fawcett, Isham & Co.*, was in the latter. So the only question now is, *whether a party having no title whatever to personal property, and no indicia of ownership save naked possession, and that obtained tortiously, can make a good title to the property in his vendee as against the true owner.*

Upon the general subject indicated in this proposition, see 2 Kent's Com. 320.

In 1 Smith's Lead. Cas. 602, it is said that, " the general rule of the law of England is, that no man can acquire a title to a chattel personal from any one who has himself no title to it, except in market overt." On page 892 it is further said, " It is well settled, that in the absence of property and authority, a sale of chattels confers no title, even when the vendor is in possession at the time of the sale, and the vendee purchases in good faith and for value." *Wilkinson* v. *King*, 2 Campb. 335; *Peer* v. *Humphreys*, 2 Adol. & Ell. 295; *Williams* v. *Barton*, 3 Bing. 139; *Everett* v. *Saltus*, 15 Wend. 475; *Stanley* v. *Gaylard*, 1 Cush. 836.

On page 894, ib., it is said; " It is evident, therefore, under all the decisions, that although the possession of chattels per-

sonal is *prima facie* evidence of property, and consequently of the right to sell, yet that *when property does not in fact exist, possession confers no right, either on the holder 'himself or on a vendee under him, who may have paid a valuable consideration on the faith of such possession.*"

This whole subject, as to the power and right of one to sell personal property, when he has no title himself, is fully illustrated in the cases of *McCombie* v. *Davis*, 6 East, 538 ; 7 ib. 5 ; *Pickering* v. *Busk*, 15 East, 38 ; *Barton* v. *Williams*, 5 B. & Ald. 395 ; 3 Bing. 139 ; 2 B. & Ad. 484 ; 13 Pick. 294 ; 14 Wend. 31.

It is only, therefore, where the *real owner*, with the possession of the property, gives also a *proper documentary evidence* of title, that he is estopped and barred by such sale; and where *no such documentary evidence* of title is given by the owner, no title passes on a sale by one who has no title himself. The rule in England, and in some States in this country, has been altered by statutes, which provide that bills of lading, dock warrants, warehouse certificates, and other documents used in the ordinary course of business as proof of the right to sell or transfer the goods, shall be taken to be documents of title within the act. See Acts, 6 Geo. IV. & 5 & 6 Vict. It has uniformly been held that these instruments are made documentary evidences of title by *statute*, and as such were wholly unknown at common law. *Evans* v. *Truman*, 2 B. & A. 886 ; 3 Ibid. 320 ; 1 Smith's Lead. Cas. 895, and cases cited ; 4 Man. & Gran. 295, 326 ; 14 M. & W. 665. And nothing now is considered a document of title which will authorize a sale by one who has no real title, but an instrument under the hand of the party or owner himself, except such as are expressly mentioned in those statutes.

Messrs. Thomas Hoyne and C. A. Gregory, for the defendants in error.

For the defendants we may safely claim that their title rests upon the *bona fides* of their purchase, even without claiming

the protection of the copartnership which existed as to third persons between the plaintiffs and the vendor of the property (Stevens), under this contract.

Because the original owners placed their property in the hands of another person under such circumstances or in such a manner that the law implies a right and power on the part of that person to make a valid sale thereof (to a *bona fide* purchaser without notice), although between himself and the original owner no such right existed. *Vide* Story on Sales, § 202; *Irving* v. *Motley*, 7 Bing. 543; *Barnes* v. *Bartlett*, 15 Pick. 71.

Again, defendants are entitled to hold the property as against the true, original owner in this case, because the case at bar falls within that large class of cases, where, though the title of the vendor may have been obtained by *fraudulent means*, yet " he can make a valid sale of the goods to a *bona fide* purchaser for a valuable consideration so as to deprive the original owner of his power to reclaim them."

It is not like the case where the vendor has no title and has obtained possession of the goods by felony or *chance*. *Vide* Story on Sales, § 200; *Hollingsworth* v. *Napier*, 3 Caines Cases, 182; *Mowrey* v. *Walsh*, 8 Cow. 238; *Toott* v. *Warren*, 2 Fairf. 227; *Wheelwright* v. *Depeyster*, Johns. 471; *Cross* v. *Peters*, 1 Greenlf. 376; *Conyers* v. *Ennis*, 2 Mason, 236; *Noble* v. *Adams*, 7 Taunt. 59; *Buffington* v. *Gerrish*, 15 Mass. 156; *Root* v. *French*, 13 Wend. 570; *Hill* v. *Perrot*, 3 Taunt. 274; *Smedley* v. *Goodery*, 3 M. & Sel. 191; *Bradley* v. *Anderson*, 1 Cromp., Mees. & Rosc. 490; *Parker* v. *Patrick*, 5 Term, 175, cited in 7 Bing., *ante*, 542.

This case stands upon the principle enunciated in 13 Wend. 572 (*Root* v. *French*), and followed by the Supreme Court of this State; it is, that an innocent third person finding a vendor who sells to him, in possession of the property sold, without notice of any fraud affecting such possession, showing that it is otherwise than a rightful and lawful possession, may obtain a superior title to that of the lawful owner *who enabled the person in possession* to deal with it as his own, by clothing him

with the evidence of that ownership, without which the innocent purchaser would not have become a purchaser. See also, *Jennings* v. *Gage*, 13 Ill. 614; *Ketchum* v. *Watson*, 24 Ill. 591; *Roberts* v. *Haskell*, 20 Ill. 65.

But in relation to the copartnership, in view of its effect upon the rights of the defendants:

The court in 24 Ill. decided that the contract between the parties for the manufacture of the leather, did constitute a copartnership (page 480); but also held that as between the parties themselves the right of property in the leather after it was manufactured was in Fawcett, Isham & Co.; but they expressly desire *it to be remembered* (page 485), that "in that case it is not a question between *third persons and the parties to the agreement growing out of the subject matter of the agreement*, but it arises between and only affects *parties to the agreement.*"

Here was a joint enterprise engaged in by Fawcett, Isham & Co., and the Stevens' in which both parties embarked money, stock, labor, and expressly agreed to share "*in losses as well as profits.*" There was such a partnership between them as would protect a purchaser from Stevens. Story on Part., sec. 36, 27; *ex parte Hamper*, 17 Vesey, 404; *ex parte Watson*, 19 ib. 459; *Dey* v. *Boswell*, 1 Campb. 320; *Selby* v. *Hutchinson*, 4 Gilm. 329.

Messrs. McAllister, Jewett & Jackson, for the plaintiffs, in reply.

The defendants, in alleging a partnership between Fawcett, Isham & Co., and the Stevens' for the purpose of making good the sale to them, is bound to show either a partnership in fact, which is always sufficient, or that they acted upon such representations, statements or facts as estop the plaintiffs from showing that no partnership did exist. See 1 Smith's Lead. Cas. 729, and cases cited.

That the defendants purchased in view of any such understanding is contradicted by the fact that they had no knowledge of the plaintiffs, and dealt with perfect strangers.

But the contract in question, between Fawcett, Isham & Co., and the Stevens', does not create a copartnership in any sense; it does not provide for a sharing of profit and loss, in any proper sense of that phrase, when used as a test or criterion of a copartnership. The case of *Bowman et al.* v. *Bailey*, 10 Vermont, 170, fully illustrates our views on this point. See also, *Dwinel* v. *Stone*, 30 Maine, 384; *Smith* v. *Wright et al.*, 5 Sandf. 113; *Loomis* v. *Marshall et al.*, 12 Conn. 60; *Denny et al.* v. *Cabot et al.*, 6 Pick. 335; *Dunham* v. *Rogers*, 1 Barr. 255; *Buckle* v. *Eckhart*, 1 Denio, 337.

Mr. JUSTICE BREESE delivered the opinion of the Court:

This is an action of trover and conversion to recover the value of two thousand sides of hemlock-tanned soleleather. There was a trial in the Superior Court of Chicago, and a verdict and judgment for the defendants. The case is brought here by the plaintiffs by writ of error, and on bill of exceptions.

The title to this leather, as between the plaintiffs and the Stevens, was settled by this court in an action of trover brought for the conversion by the Stevens' of nine thousand sides of hemlock-tanned soleleather, and established in the plaintiffs. *Stevens* v. *Fawcett et al.*, 24 Ill. 483.

The leather is identified as the leather tanned for the plaintiffs by the firm of W. H. & F. Stevens, and a demand of it was made by the agent of the plaintiffs, of the defendants in whose possession it was found.

How did the defendants acquire a title to this leather?

It seems, from the proof, that a large quantity of hides had been intrusted to W. H. & F. Stevens, the owners of a tannery, by the plaintiffs, to be tanned at a certain price per pound, and on a sale of the leather by the plaintiffs after deducting all charges against it, the net profits were to be divided between the parties. The contract was made in August, 1855, and was to continue three years, Stevens agreeing not to tan hides for others, except for a few customers in the neighborhood during that time. The hides, when tanned, were to be delivered to

the plaintiffs at a dock in New York city. In the month of September, 1856, Fletcher Stevens, one of the firm, shipped, in a clandestine manner, a large quantity of the leather manufactured from the plaintiffs' hides, to places other than the city of New York. During this movement of the leather, Stevens assumed the name of F. Stafford, and had in his employment, a man by the name of William H. Stanton, who, at the suggestion of Stevens, assumed the name of L. L. Stratton. Two thousand sides of this leather were shipped in 1857, by Stevens to Chicago, consigned to " F. Stafford," and on their arrival, were taken possession of by Stanton, under the assumed name of Stratton, who had been sent there by Stevens for that purpose and to dispose of the leather.

Stanton — Stratton, soon made the acquaintance, at Chicago, of one Rose, before then an entire stranger, who introduced Stanton, by his assumed name, to the defendants, who, thereupon, purchased of him two thousand sides of the leather, and made payment therefor.

The plaintiffs having traced their leather into the hands of the defendants, demanded a return of it, and on refusal to surrender it, they brought this suit.

The defendants set up no other title to the leather, than this purchase, under the circumstances, thus briefly detailed, and the question arises whether such a purchase divests the true owners of their title to the property.

The defendants contend that they bought the property in good faith, in the regular course of business, paying a full price in open market, and with no knowledge of a want of title in their vendor, in whose possession the property was, when purchased by them.

They insist that this is one of a large class of cases, where, though the title of the vendors may have been obtained by fraudulent means, yet he can make a valid sale of the goods to a *bona fide* purchaser for a valuable consideration, so as to deprive the original owner of his power to reclaim them. Numerous cases are referred to in support of this view, into which we have looked, and find, for the most part, they are

cases where an actual sale of the goods had been made, and consummated by a delivery, and in some cases accompanied by a bill of the goods.

The case of *Root* v. *French*, 13 Wend. 572, is singled out by the defendants, as announcing the principle on which this case stands, and it is, that an innocent third person finding a vendor, who sells to him, in possession of the property sold, without notice of any fraud affecting such possession, showing that it is otherwise than a rightful and lawful possession, may obtain a superior title to that of the lawful owners who enabled the person in possession to deal with it as his own, by clothing him with the evidence of that ownership, without which the innocent purchaser would not have become a purchaser.

That was a case of an absolute sale and delivery of the goods to the fraudulent purchaser, and his note taken at ninety days for the price. In three days thereafter the purchaser transferred these goods to the defendant, to indemnify him for responsibilities he had assumed as indorser and as a creditor to a large amount. The purchase was made on the eve of a bankruptcy. A demand was made on the transferee for the goods, and on refusal to deliver them up, replevin was brought. The case showed that the purchaser of the goods was hopelessly insolvent. The court say, as between the plaintiff and Jenkins, the purchaser, Jenkins, had no title to the property in question. It is a general rule that a person who has no title to property can convey none; but to this rule there are some exceptions. To create such exception, and to give a third person a better title and a superior equity to the true owner, such third person must have given value for the property, &c., and without notice of the fraud. Such innocent third person is a *bona fide* purchaser for a valuable consideration. In such a case, the vendor, who has been defrauded of his property, and the *bona fide* purchaser from the fraudulent vendee, are both innocent parties; and when one of two innocent parties must suffer from the fraud of a third, the loss should fall on him who enabled such third person to commit the fraud. Possession of personal property is *prima facie* evidence of property.

And to the same effect is the case of *Jennings* v. *Gage et al.*, 13 Ill. 614, as to the equities between the parties. Between parties who are both innocent, the loss should fall upon the party who sold and delivered the goods to the fraudulent purchaser, thus enabling him to commit a fraud, by means of his possession of the goods voluntarily given to him by the owners with the intention of a sale.

But this court, in that case said, the principle does not apply to sales on condition, and when the original owner has never consented to the transfer of the property, referring to *Bradsen* v. *Brooks*, 22 Maine, 463; *Draper Manuf. Co.* v. *Waterston*, 3 Met. 9; 2 Kent's Com. 497. And the court further said, that it is a universal and fundamental principle of the law of personal property, that no man can be divested of it without his own consent. *Saltus* v. *Everett*, 20 Wend. 275; *Arb* v. *Putnam*, 1 Hill, 303. In all these cases, cited by the defendants' counsel, the property was transferred to the purchaser, by the consent of the owner, under the form of a regular sale and delivery, and therein differ in a most important particular from the case we are considering. Here has been no transfer of the property by the consent of the true owners, nor have they, voluntarily, under the form of a sale, delivered the property to the defendants' vendor, or clothed him with any of the *indicia* of ownership, in the sense and meaning of any of the cases cited. We apprehend no well considered case can be found in the books, where a party has been deprived of his property without his consent, or where a party selling has been adjudged competent to convey to a purchaser a better title than he himself possessed.

The general rule of law, sanctioned by common sense, is, that no man can, by his sale, transfer to another the right of ownership in a thing wherein he himself had not the right of property, except, and this for the sake of sustaining the currency, in the instances of cash, bank bills, checks and notes payable to bearer or transferable by delivery in the ordinary course of business, to a person taking it, *bona fide*, and paying value for it. The other exception, of title acquired by sale in

*market overt*, of stolen property, though recognized in England, has been uniformly held to have no force in this country. No one can sell a right when he himself has none to sell This is a proposition so self-evident, that argument cannot elucidate or strengthen it.

It is true, that possession of personal property is one *indicium* of ownership, and is *prima facie* evidence of title to the thing. The bare possession of goods is a strong inducement to believe that the possessor is the true owner, and when to that is added proof of an actual sale and delivery to him, by the real owner, though by fraudulent pretenses, a subsequent sale by such purchaser to a *bona fide* purchaser, without notice of any fraud in the alleged sale and delivery to his vendor has been held, as is seen by the cases cited, and may be seen in a multitude of other cases, to confer title upon such subsequent *bona fide* purchaser. The maxim of "he who trusts most shall lose most," is held to obtain in such cases, as will be seen by *Root* v. *French*, and *Jennings* v. *Gage*. This maxim, so generally accepted, may be open to some just criticism. Does a party who parts with the possession of property, or the use of a thing, capable of easy identification, trust more than he who pays his money to a vendor upon his affirmance or assurance that the thing sold is his own, and he a stranger. There being, upon the sale of personal property, an implied warranty of title, the vendee has his action against the vendor, if his title proves deficient.

The buyer must then take care that he is not deceived by dealing for a pretended title, or that his vendor is able to respond in damages for any loss which may happen to the vendee.

The general rule is, beyond all controversy or dispute, that no man can acquire a title to chattels from a person who has himself no title to them. *Wheelright* v. *Depeyster*, 1 Johns. 478, and authorities cited. The exceptions we have stated, being those of cash and certain commercial paper, and of sales in *market overt*. Then, even if the property sold was obtained by a felony, unless the buyers knew that the property was not

in the seller, or there was any other fraud in the transaction, the purchaser would get a good title against the real owner, except he should be the king.

But the defendants here seem to consider, that a purchase of goods in the ordinary way in a commercial city, in open market, is equivalent to a purchase in *market overt* under the English common law. In the case cited, which was a sale of coffee in open market, Ch. J. KENT said, he knew of no usage or regulation within the State of New York, no *Saxon* institution of *markets overt*, which controls or interferes with the application of the common law. In *Mowrey* v. *Walsh*, 8 Cowen, 241, the court said, referring to the case cited in 1 Johns., 471, as we have no such market, sales here can have no other effect than mere private sales in England. It follows that any sale of stolen goods does not divest the title of the owners.

In *Ventress et al.* v. *Smith*, 10 Peters, 175, it was said this doctrine of *markets overt*, which controls and interferes with the application of the common law, has never been recognized in any of the United States, or received any judicial sanction.

*Market overt* is defined to be a fair or market held at stated intervals, in particular places, by virtue of a charter or permission, 2 Black. Com. 449, to which our ordinary markets or stores for the sale of merchandise, bear no resemblance. The reason why a sale of stolen property, made in *market overt*, conveyed a title to the purchaser, is understood to be that, as the market was held at stated intervals, in particular places, and known to the whole community, those who had lost property by theft or otherwise, could be present and make known their loss; failing to do so, and as, by the publicity of the transaction, every assurance was given to purchasers that the sale was honest and fair, it was but just the purchasers should be protected in the title thus acquired.

The defendants obtained the possession of this leather through a breach of trust, amounting almost, if not quite, to larceny, on the strength of a naked possession in the vendor, without any

other *indicium* of title whatever, and without even knowing the name of the vendor, who was a perfect stranger, and wholly unknown to the business men of Chicago, and without any inquiry into the source of title of the vendor.    Possession of the property was but *prima facie* evidence of its ownership, and is but one of the *indicia*.    The doctrine is, as in *Jennings* v. *Gage et al.*, if the real owner of goods suffer another to have possession of his property, and thus enable him to hold himself out to the world as having not the possession only, but the property, then a sale by such a person might bind the true owner.    The real owner thus suffering the vendor to have the possession, and delivering to him documentary evidence of title, does, by this possession, and the documents with which the real owner has endowed him, enable him to hold himself out to the world as the true owner; and, if any loss happens, he who has thus clothed the vendor with the power to deceive, ought to bear the loss.

Here the possession of the leather was not delivered by the plaintiffs to the defendants' vendor; it was furtively obtained by him under circumstances which would convict him of embezzlement, at least, under section 71 of our Criminal Code. No invoice or other bill of the leather was produced, no inquiry made about ownership, and the vendor's name not even known. Under such circumstances, to say that this felonious bailee could confer a title on a purchaser by any sale he could make, is saying what common sense, justice or correct legal principles will not sanction.    Defendants' vendor had not the shadow of title, and, therefore, could convey none by a sale.

But it is said, the vendor was a partner of the plaintiff in this leather, and as such had a disposing power over it to sell it. If the contract between the parties is examined, it will be seen that the Stevens' had no other possession of the property than such as was necessary to place it in a condition to be transported to a dock in the city of New York, for the plaintiffs. From the time the leather left the tannery it continued to be the property of the plaintiffs, and in contemplation of law was in their possession and control all the time, the Stevens' having

no right or authority to meddle with it, nor any ownership in it, their right extending only to a share of the proceeds after the plaintiffs should have made sale of it and nothing more.

Assuming a name which did not belong to him, and inducing his agent, Stanton, to do the same, the defendants' vendor took this leather to Chicago, and there, unknown to the business men of that city, or to his vendees, the defendants here, with no evidence of title, documentary or mercantile, relying on his bare possession, fraudulently, if not feloniously obtained, the defendants become the purchaser of two thousand hides, of the estimated value of near eight thousand dollars. The ordinary inquiries and caution, usually exhibited in a large sale like this, seem not to have been made or observed in this transaction, and the question is plainly and distinctly raised, has the real owner lost his title to the property by the force of the facts proved? From the most careful examination of adjudged cases on this subject, and the most mature reflection and consideration we have been enabled to give it, we are satisfied that the plaintiffs had never parted with the property in this leather, or bestowed the possession of it upon any one, with a view to a sale and disposal of it; nor have they given by their own voluntary act or consent to any one, such evidence of a right to sell it, as according to the custom of trade, and the understanding of community usually accompanies the authority for disposal. The defendants' vendor had but a naked possession. This cannot prevail against the right of the real owner, who is entitled to follow his property, and reclaim it wherever found. The buyer should have "taken care" that the title was in his vendor—he having no title, the defendants acquired none.

The rule we have sanctioned may seem a rigid one, and may involve purchasers in some perils, but it is a safeguard to the protection of the owner's rights in goods and other property necessarily placed under the temporary control of others, and in their legal, though qualified possession.

The views here presented dispose of the instructions. They maintain the correctness of the second, sixth and seventh

instructions in the language and terms as prayed, and dissent from the modifications of the second and sixth, as made by the court. They also are at variance with the instructions given by the court on its own suggestion. For these errors of the court, in refusing the seventh instruction, and modifying the second and sixth, and refusing to give them as asked, and in giving the instructions by the court on its own motion, the judgment must be reversed, and the cause remanded for further proceedings not inconsistent with this opinion.

*Judgment reversed.*