SHOTWELL, Appellant, v. SIOUX FALLS SAVINGS BANK, Respondent.

(147 N. W. 288.)

**Banks and Banking—Grain Elevator Deposit—Draft by Operator On Grain Shipped—Draft Applied by Bank on Operator's Overdraft—Liability of Bank to Owner of Grain.**

Where an owner deposited grain in a grain elevator, and it was placed in a bin by itself under an agreement between the parties that the operator should ship and sell it for the owner, **held**, that the owner thereby clothed the operator with indicia of right to sell and pledge same; and where the operator shipped the grain and obtained bill of lading in his own name as consignor, and deposited a draft for the price with a bank, which credited him on his account therewith, including an existing overdraft for part of its amount, the bank was liable to the owner for amount of the deposit, less the amount paid out on the deposit on the operator's checks before notice by owner to bank of his ownership of the deposit, but could not deduct the amount of the overdraft.

Smith, P. J., and McCoy, J., dissenting.

(Opinion filed May 18, 1914.)

Appeal from Circuit Court, Minnehaha County.    Hon. JOSEPH W. JONES, Judge.

Action by E. M. Shotwell against the Sioux Falls Savings Bank, to recover for part of the proceeds of sale of plaintiff's grain deposited in a grain elevator and sold by the operator, draft

for which proceeds had been deposited in defendant bank in the name of the operator. From a judgment for defendant, and from an order denying a new trial, plaintiff appeals. Reversed, with directions to enter judgment for plaintiff.

*Chas. P. Bates,* for Appellant.

The funds received from the sale of plaintiff's wheat were trust funds, and did not lose their character by being deposited to the individual account of Stegner. A depositary who has received from a trustee or agent funds belonging in fact to the principal or beneficiary, cannot appropriate them to satisfy a debt owing it by such agent or trustee. In such case the beneficiary or principal can follow and claim the trust funds. Bolles on Modern Law of Banking, pp. 501-503; Bunett v. Bank, 38 Mich. 631; Cady v. So. Omaha Nat Bank, 65 N. W. 906; 68 N. W. 358; Bank v. Ingersoll, 89 N. W. 618; Davis v. Panhandle Bank, 29 S. W. 926; Farmers & Merchants Bank v. Farwell, 58 Fed. 633; Porter v. Roseman, 74 N. E. 1105.

If the defendant be compelled to account to plaintiff for the proceeds of the draft and pay him the balance remaining in the bank after deducting the amount it has paid out on Stegner's checks, it will lose nothing or be in any worse situation than before it credited the amount of the draft to Stegner's account.

*Boyce, Warren & Fairbank,* for Respondent.

Bankers may in some circumstances render themselves liable for the misapplication of trust moneys committed to their care, but generally speaking, they are under no obligation to make inquiries as to the source from which moneys paid in by a customer are derived, or the purpose for which cheques are drawn by him. Grant on Banking, 6th edition, page 194; Thompson v. Clydesdale Bank (1893) A. C. 287, 289; Union Stock Yards National Bank, v. Gillispie, 137 U. S. 411; 34 L. Ed., 724; Union Stock Yards National Bank v. Moore, 25 C. C. A., 150; Tough v. Citizens Bank, 132 Pac. 174 (Kan.) ; Denton National Bank v. Kenny, 81 Atl., 227 (Md.) ; First State Bank of Bonham v. Hill, 141 S. W., 300 (Tex.) ; Globe Savings Bank v. National Bank of Commerce, 89 N. W., 1030 (Neb.) ; Smith v. Des Moines National Bank, 78 N. W. 238 (Ia.) ; Meyers v. New York County Nat. Bank, 55 N. Y. S., 504; In re Plankinton Bank, 58 N. W., 784 (Wis.) ; Sparrow v. State Exchange Bank, 77 S. W. 168 (Mo.) ;

McStay Supply Co. v. John S. Cook & Co., 132 Pac. 545 (Nev.)

Stegner did not violate his instructions. He was not instructed to ship in plaintiff's name, but was permitted to ship in his own name and in the usual way.

The plaintiff has not traced the proceeds into defendant's hands; and even had it received the same it had no notice or knowledge that plaintiff had any interest therein, and rightfully applied same to the overdraft of the depositor, Stegner.

WHITING, J.   In August, 1912, plaintiff delivered to one Stegner, the operator of a grain elevator, about a car load of wheat belonging to plaintiff. The wheat was delivered to Stegner at the elevator, but was placed in a bin by itself and kept separate from other wheat. This wheat was not purchased by Stegner, and the agreement between him and plaintiff was that he should ship and sell the wheat for plaintiff. Plaintiff testified that it was expressly understood that the wheat was to be shipped in his name; while Stegner testified that nothing was said as to whose name the grain should be shipped in. Stegner loaded the wheat into a car and, by a bill of lading in which he was named as consignor, consigned the same to a commission firm at Minneapolis. Upon receiving the bill of lading from the railroad company, Stegner, on August 26th, went to defendant, with whom he had a general banking account, and drew a sight draft for $500.00 on the commission firm. At the time the draft was drawn, it, with the bill of lading, was delivered to defendant bank for deposit, and the bank, at Stegner's request, credited Stegner's general banking account with the amount of such draft. The sight draft, with the bill of lading attached, was immediately forwarded by defendant to its Minneapolis correspondent by whom it was credited to defendant. Upon presentation to the commission firm the draft was honored. At the time defendant gave Stegner credit for the amount of the sight draft, his general bank account was overdrawn to the amount of $346.65. Defendant, by balancing Stegner's account, immediately applied $346.65 of said $500.00 to the payment and satisfaction of said overdraft. Between August 26th and September 11th, following, Stegner issued checks, in favor of third parties, against his account, sufficient to exhaust the remainder of said $500.00 deposit. On September 11th, defendant's account with Stegner was bal-

andced and closed. On September 23rd plaintiff served the following notice on defendant:

"To the Sioux Falls Savings Bank:

On August 24, 1912, George A. Stegner, of Sioux Falls, drew a draft for $500.00 on Woodward & Company, a grain commission house of Minneapolis, Minn., to apply on the proceeds of the sale of a carload of wheat shipped by him, in his name, to Woodward & Company, * * * the bill of lading for the same being attached to the draft, and deposited such draft with you. I am informed that Woodward & Company sold said carload of wheat and from the proceeds thereof paid you the amount of this draft, viz: $500.00, and that you have credited the same to Mr. Stegner's personal account with you.

"The wheat so shipped by Mr. Stegner to Woodward & Company and on account of which he drew said draft, belonged to me and he was not authorized either to ship or sell the same in his own name, but was to ship said wheat to Woodward & Company in my name to sell for me and on my account. The amount received by you from Woodward & Company on said draft belongs to me, and I hereby demand that you account to me for the amount so received by you and pay the same to me.

E. M. Shotwell."

Defendant having refused to account for any part of the proceeds of said wheat, plaintiff instituted this suit. In his complaint plaintiff alleged in substance facts as above set forth and prayed judgment: that he be adjudged to be the owner of the $500.00 draft and the moneys received in payment thereof; that defendant be required to account to him for such moneys; and that he recover from defendant the sum of $500.00 and interest from September 23, 1912, the date of the demand. At the trial, this last prayer was modified, and plaintiff asked judgment for $285.60 and interest, being the $500.00 less $214.40 that it was shown had been paid out by defendant on Stegner's checks after the deposit of the $500.00 and prior to the notice. At the close of the evidence both parties moved for directed verdict. By consent of parties the case was withdrawn from the jury and submitted to the court for determination, findings of fact being waived. The court rendered decision and judgment in favor of defendant, and refused a new trial. Plaintiff appeals from the

judgment and order denying a new trial, and assigns insufficiency of the evidence to justify the decision and judgment, and error of the court in not directing a verdict for plaintiff.

Upon this appeal, every issue of fact must be determined in favor of respondent, hence we must presume that the trial court found that nothing was said between respondent and Stegner concerning whose name the grain should be shipped in; furthermore, if material hereto, we must presume that the trial court found, and rightfully, that Stegner was conducting such a business that, when appellant left his wheat with him he clothed him with the external indicia of right to sell same and therefore to pledge it.    Nevertheless as between appellant and Stegner the grain and the proceeds thereof remained the property of appellant, and respondent should not be allowed to defend against appellant's claims to such proceeds, except to the extent that respondent has parted with value on the strength of Stegner's apparent authority to sell the grain, and therefore to pledge the bill of lading, unless the facts of this case take it out of the rules governing the passing of title to personal property, and bring it under some exception applicable only to cash and other recognized mediums of exchange. Saltus v. Everett, 20 Wendell (N. Y.) 267, 32 Am. Dec. 541; Fawcett v. Osborn, 32 Ill. 411, 85 Am. Dec. 278. Respondent claims that, when a bank, without notice of the trust character thereof, takes from a trustee, for deposit to the trustee's personal account, cash or other recognized medium of exchange, it can credit such deposit against such trustee's overdraft and defend against any action by the cestui que trust to recover such trust fund though, as against such cestui que trust, the deposit was wholly unauthorized and therefore wrongful.    Appellant contends for the rule contended for by Bolles in Modern Law of Banking, 501, where the author says:

"Why should not the bank be required to refund to the rightful owner in all cases wherein its situation would not be worse than it was before receiving payment? No rule is better established than this: that trust funds do not lose their character by reason of depositing them to the individual account of the depositor. If, therefore, they will possess this character, why should

they not be recovered, provided they can still be traced, regardless of their possessor."

It must be admitted that the courts have uniformly recognized a difference between ordinary personal property and cash or other recognized medium of exchange when considering the question of how far the true owner of property can pursue the same or its proceeds where such property or proceeds has passed into the hands of innocent third persons through the wrongful act of a trustee of such property. In the American decision which perhaps more than any other has been cited and quoted from in the courts of this country it is said:

"It is absolutely necessary for practical business transactions that the payee of money in due course of business shall not be put upon inquiry at his peril as to the title of the payor. Money has no ear-mark. The purchaser of a chattel or a chose in action may, by inquiry, in most cases, ascertain the right of the person from whom he takes the title. But it is generally impracticable to trace the source from which the possessor of money has derived it. It would introduce great confusion into commercial dealings if the creditor who received money in payment of a debt is subject to the risk of accounting therefor to a third person who may be able to show that the debtor obtained it from him by felony or fraud. The law, wisely, from considerations of public policy and convenience, and to give security and certainty to business transactions, adjudges that the possession of money vests the title in the holder as to third persons dealing with him and receiving it in due course of business and in good faith upon a valid consideration. If the consideration is good as between the parties, it is good as to all the world. 'Money,' said Lord Mansfield, in Miller v. Race, before cited, 'shall never be followed into the hands of a person who *bona fide* took it in the course of currency and in the way of his business.'" Stephens v. Board of Education, 79 N. Y. 183, 35 Am. Rep. 511.

Pomeroy, in commenting upon the distinction between money and other property as recognized in the decisions following the holding in the Stephens case, announces, as the sole reason for this distinction, the fact that money is not "ear-marked."

The courts should not be unmindful of the necessities of business and we have no fault to find with the rule announced

in the Stephens case, provided that in applying such rule courts will not refuse to shut their eyes to the clear equities of the particular case and will insist on such rule being subject to that other well-established and most just rule, recognized by this court in Finch et al. v. Park, 12 S. D. 63, 80 N. W. 155, 76 Am. St. Rep. 588, Id. 15 S. D. 339, 89 N. W. 654, and which is so clearly set forth in Brand and Co. v. Williams 29 Minn. 238, 13 N. W. 42, wherein the court through Justice Mitchell, said:

"An action for money had and received can be maintained whenever one man has received or obtained the possession of the money of another, which he ought in equity and good conscience to pay over. This proposition is elementary. There need be no privity between the parties, or any promise to pay, other than that which results or is implied from one man's having another's money, which he has no right conscientiously to retain. In such case the equitable principle upon which the action is founded implies the contract and the promise. When the fact is proved that he has the money, if he cannot show a legal or equitable ground for retaining it the law creates the privity and the promise. 2 Chitty, Cont. (11th Am. Ed.) 899; Mason v. Waite, 17 Mass, 560; Hall v. Marston, 17 Mass. 574; Knapp v. Hobbs, 50 N. H. 476; Eagle Bank v. Smith, 5 Conn. 71 [13 Am. Dec. 37]. It is not necessary that the defendant should have accepted the money under an agreement to hold it for the benefit of the plaintiff, or that the party from whom he received it intended it for the plaintiff's benefit."

We concede that a bank has a lien upon deposits and other property coming into its hand, to secure overdrafts and debts owing from the depositors; that courts are justified, upon slight evidence, in holding that a party, by depositing funds or other property with the bank, authorizes the application of such funds or property to any overdraft or other indebtedness due from him to the bank; that. in the case of money or other circulating medium, neither a bank nor an individual should be compelled to take it at the same risk and peril that it would other personal property; that one should not be put upon inquiry to ascertain the true ownership of a fund of such character where there is nothing to fairly give notice of the source from which the fund was received or that the fund does not belong to the depositor

or payor; and that, where a bank has innocently taken, from one not the true owner thereof, money, drafts, or checks, and applied the same upon a debt or overdraft, and, relying upon such deposit and application thereof, has placed itself in a position where it would be inequitable to require it to account to the true owner of the fund, the bank should not be holden to the true owner of such fund. We deny that there is any recognized principle of law, or even any reason founded upon that necessity which is said to know no law, that will sustain either the justice or necessity of holding that, when a fund, even though it consists of money, can be fully and clearly traced into the hands of one who has neither paid a valuable consideration therefor nor changed his relation to the person from whom the fund was received so as to give rise to any equitable defense against the claims of the true owner of such fund—when one man has money which in equity and good conscience belongs to another—such fund should not be recovered by the equitable owner thereof. Applying, without limitation, the rule contended for by respondent would permit a bank to retain, as against the true owner, money procured through highway robbery and deposited by the robber to meet an overdraft—a case where, upon the one side the money is procured through no confidence or trust placed in the wrongdoer, while, upon the other side, the money is received from the wrongdoer whom the bank has allowed to become indebted to it; not a case where the law must determine as between two persons who have placed confidence in a third, and where it might be said that he who confided most must suffer. We refuse to adopt any rule that must lead to such results.

A. deposits in a bank the money of C., making the deposit in his own name; A. owes the bank nothing and the money remains on deposit without being checked out; the authorities agree that C. can recover this money from the bank, and why?—because it is a trust fund *belonging to C.* and in and to which the bank can have no rightful claim as against C. Under those facts no suggestion is made that money has no ear-marks. A goes to the bank with C.'s money and deposits it at a time when his account to the bank is overdrawn; C. ascertains where his money has gone and, before there has been any change of circumstances, except the mere crediting of A's account with the amount depos-

ited, demands the money; upon what possible rule of equity or why, as a matter of good conscience between C and the bank, or upon what rule of business necessity, should the bank retain this money from C? Absolutely none. The bank had no right, legally or equitably, to be paid out of this or any other fund not belonging to A; it allowed the overdraft relying upon the confidence it had in A, and not in reliance upon any expectation that A would pay such overdraft out of some third party's money; it did not change its position to its detriment; why should C be, against his will, forced to pay A's debt to the bank, and this inequitable ruling be placed on the ground either of necessity, or that other equally unsatisfactory ground—that money has no ear-marks? How much more logical it would be to hold that the true owner should recover so long as no equities have arisen in favor of the bank, but that he cannot recover when, under all the circumstances surrounding the case—the nature of the fund, lack of knowledge of true ownership thereof, reliance placed upon the deposit of such funds, change of situation as between the bank and the depositor, such as surrender of evidence of indebtedness—equity and good conscience demand that the bank be absolved from liability to the true owner. There is no difference between the above illustration and the case before us; when Stegner overdrew his account, it was by permission of respondent, which, to the extent of the overdraft and upon the faith it had in Stegner, allowed him to become indebted to it; it did not and could not rightfully allow an overdraft in the hope and upon the strength that Stegner would pay the same out of *anyone's funds but his own*. When Stegner made the deposit, by necessary implication, he authorized the bank to apply such deposit upon his overdraft; but the bank had, as against appellant, neither a legal nor an equitable right to this money; when it took it and in ignorance of its true ownership, credited Stegner's account therewith and honored checks against it, it put itself in a position where, to the amount of such checks, it would be inequitable and unjust, in view of the necessities of business, to compel it to restore the fund to appellant and he must suffer such loss. While the very nature of the trust fund deposited and the necessities of commerce did, under the facts of this case, in equity and good conscience, excuse respondent from any duty of attempting to

trace the ownership of the draft and of the car of wheat, yet it must be borne ·in mind that to the extent of the amount which appellant seeks to recover, respondent never changed its position for the worse so far as any evidence shows. It credited Stegner's account with the amount of the draft, but it did not, by so doing, lose any right of action against Stegner for the amount of such overdraft, as Stegner could not claim a payment by this draft. Therefore no necessity of commerce required or justified the bank in refusing to pay over to appellant the amount of such draft less checks paid after the deposit. In Pennell v. Defell, 4 De Gex, M. & G. 372, it was said:

"When a trustee pays trust money into a bank, the account being a simple account with himself, not marked or distinguished in any other manner, the debt thus constituted from the bank to him is one which, as long as it remains due, belongs specifically to the trust, as much and as effectually as the money so paid would have done, had it specially been placed in a particular depository, and so remained."

It seems to us that the facts in the case at bar rightfully call for such words as were used by the Lord Chancellor in Murray v. Pinkett, 12 Clark & F. 764, when he said:

"Then here are two equities; that is to say, here is a trustee of the property, which he held for the benefit of the *cestuis que trustent*, endeavoring to create an equity upon that property to secure his own debt. Which of these two equities is to prevail? Undoubtedly, the former (the equity of the cestui que trust.)"

See also F. & M. Bk. v. Farwell, 58 Fed. 633; 7 C. C. A. 391.

The principle we are contending for is fully recognized in Wilson & Co. v. Smith, 3 Howard (44 U. S.) 763, 11 L. Ed. 820, a case wherein plaintiffs had drawn a draft upon their debtor and sent it to their agent for collection, this agent sent the collection to its own agent which collected the amount of the draft and, supposing the draft to be the property of the party from whom he received it, which party was indebted to him, he credited him with the amount collected and did not remit same. Having refused to pay plaintiffs the amount collected, plaintiffs brought this action, and in holding that plaintiffs could recover, the court said:

"Upon this part of the case, as well as upon the question certified, we think the case of The Bank of the Metropolis v. The New England Bank decisive against the defendant. It appears from the statement that he made no advances, and gave no new credit to St. John on account of this bill. He merely passed it to his credit in account. Now, if St. John had owed him nothing, upon the principles we have already stated, the plaintiff would be entitled to recover the money; and we see no reason why he should be barred of his action because St. John was debtor to the defendant, since the case shows that he incurred no new responsibility upon the faith of this bill, and his transactions with St. John remained in all respects the same as they would have been if this bill had never been transmitted to him."

The above holding is affirmed in Bank of Metropolis v. New England Bank, 6 Howard (47 U. S.) 209; 12 L. Ed. 408, and in United States v. State Bk. (6 Otto) 96 U. S. 30, 24 L. Ed. 647. To the same effect is the case of Porter v. Roseman, 165 Ind. 255, 74 N. E. 1105, 112 St. Rep. 222, 6 Ann. Cases 718, a case identical with the one at bar in principle; the court said:

"Appellee thus having in his possession money which *ex aequo et bono* belonged and ought to have been returned to appellant, an action for money had and received might have been well brought for its recovery; and it was not material how the money came into his hands, if the plaintiff is justly entitled to receive it. In such a case the law implies a promise to pay."

This principle was also fully recognized in Davis v. Bk. (Tex. Civ. App.) 29 S. W. 926, a case where the bank had not changed its position so as to create equities in its favor. The court said:

"There is neither allegation nor evidence that the bank lost its debt upon Hancock by reason of this transaction, before it was advised that he was not entitled to this credit; and, in the absence of such evidence, we do not see upon what principle it should be allowed to retain this money. The evidence is undisputed that the proceeds of these three cars of calves, as between Hancock and appellant, did in fact belong to the latter, and that the former had no right whatever to use it. Under these circumstances, it is perfectly manifest that the bank would have

no right to appropriate appellant's money to the satisfaction of an account which Hancock already owed it."

We are not unmindful of the later case of Bk. v. Hill, (Tex. Civ. App.), 141 S. W. 300, but in that case no question of existing equities seems to have been considered. Certainly the following from Burtnett v. Bank, 38 Mich. 630, is directly applicable:

"But we are not aware of any principle which will enable a depositary who has received from a trustee or agent a fund belonging in fact to the principal or beneficiary to appropriate it by his sole act to his own debt held against the trustee or agent and thereupon to insist that his want of knowledge of the true ownership is sufficient to guard such inequitable appropriation and bar the real owner from pursuing the fund."

But it might be urged that this last case has been overruled in the later decision in Garrison v. Union Trust Co., 139 Mich. 392, 102 N. W. 978, 70 L. R. A. 615, 111 Am. St. Rep. 407, 5 Ann. Cases 813. A careful reading of this decision shows that it fully supports our position. There will be found therein extensive quotations from Morse on Banks and Banking wherein the opinions in the Bank of Metropolis cases are reviewed, and the Michigan case quotes, with apparent approval, the following deduction drawn by Morse from the federal decisions, when, in speaking of one who has collected the trust fund, he says:

"But unless it has made some payment, or suffered a balance to remain undrawn, or otherwise substantially relied on the agent's (trustee's) ownership, so that it would be unjustly prejudiced by the denial of that ownership, then it cannot retain the money."

It will thus be seen that the Garrison case fully approves the rule we are contending for—the rule approved by the federal courts.

In the case of Cade v. Bk. 46 Neb. 756, 65 N. W. 906, one much like this in its facts, the court fully recognized the equitable doctrine we are contending for when it said:

"A consideration of the authorities cited leads irresistibly to the conclusion that appellant's right to the money in controversy was not affected by the deposit thereof in Fitche's name, and that he is entitled to reclaim it, notwithstanding that fact, unless there exists in favor of the bank an equitable defense, arising out of

the subsequent transactions, which should prevail as against his title."

Many decisions will be found which at first blush seem to sustain respondent's contention, but which upon careful examination will be found to recognize the rule which we hold should control. Among such decisions is that in Smith v. Des Moines Nat. Bk. 107 Ia. 620, 78 N. W. 238, wherein is to be found a most exhaustive review of the decisions touching the question of following trust moneys deposited by the trustee to his personal account in a bank. In that case the trust funds were received by the bank without any notice of their trust character and were applied in payment of a note held by the bank against the depositor. The court held that the cestui que trust could not recover of the bank, but said:

"Had the bank in this case simply relied upon its lien on the deposit, or had it treated it simply as security for the note of the investment company, which was a prior and antecedent debt, it may be that it should not be treated as a bona fide holder of the deposit. But the evidence shows that it cancelled and surrendered the note with the final assent of the investment company, and without notice of plaintiff's rights."

Upon both reason and authority the judgment of the trial court should be and is reversed and such court is directed to enter judgment for $285.60 and interest at 7 per cent from September 23, 1912, together with costs.

McCOY, J., dissenting. I am unable to concur in the majority opinion. It is my view that the law which is applicable to trust personal property generally is not applicable to money and commercial paper,—that the law as to cash and commercial paper is regulated by decisions and usages peculiar to itself. Saltus v. Everett, 20 Wend. (N. Y.) 267, 32 Am. Dec. 541; Faucett v. Osborn, 32 Ill. 411, 83 Am. Dec. 278; Linnen v. Cruger, 40 Barb. (N. Y.) 633; Hazard v. Fiske, 18 Hun (N. Y.) 277; Bank of Toledo v. Shaw, 61 N. Y. 283; Follett Wool Co. v. Utica Trust Co., 84 App. Div. 151, 82 N. Y. Supp. 597; Stollenwerck v. Thatcher, 115 Mass. 224. Appellant is not suing for the conversion of his wheat as personal property. He had an election between two remedies: (1) to sue the bank for converting his wheat; (2) to ratify the conversion and claim the

benefit of the transaction with the bank. Appellant has made his election to ratify the transaction at the bank and asks that he be adjudged to be the owner of the sight draft and of the proceeds thereof. Stegner then occupied the identical position as if he had such sight draft in his possession for the purposes of collecting the proceeds thereof and delivering the same to appellant as his agent or trustee. Now, the proceeds of this sight draft were advanced by respondent to Stegner, immediately upon the drawing of the sight draft. When respondent advanced the proceeds of the draft to Stegner he made a cash deposit thereof with respondent. This was the legal effect of the transaction at the bank as ratified by the appellant. By so ratifying such transaction appellant had made the law relating to cash and commercial paper applicable to the facts of this case. Hence, when said sight draft was issued and the proceeds thereof advanced to Stegner, such draft and the proceeds thereof became trust property in his hands, and subject to the law relating to such trust property. This was the sole theory on which this case was tried, and the only theory on which this case has been presented to this court. The respondent contends that not having notice that the same was a trust fund, at the time it received such cash deposit, it had the right under the circumstances shown, to satisfy said overdraft, although a pre-existing debt, from such cash deposit, even if Stegner might have been guilty of converting to his own use the proceeds of appellant's draft. The rule which seems to me to be sustained by the great weight of judicial authority, is that where an agent or trustee, converts to his own use and deposits in a bank and causes to be credited to his private account, money of a trust fund, without giving any notice that it is not his private property, the bank, in the absence of such notice, may apply such money so deposited to the payment of a pre-existing debt of the agent or trustee. Wood v. Bank, 129 Mass. 358; 37 Am. Rep. 366. School Dist. v. Bank, 102 Mass. 174; Smith v. Des Moines Bank, 107 Iowa, 620, 78 N. W. 238; Kimmel v. Bean, 68 Kan. 598, 75 Pac. 1118, 64 L. R. A. 785, 104 Am. St. Rep. 415; Hatch v. Bank, 147 N. Y. 184, 41 N. E. 403; Stephens v. Board, 79 N. Y. 183, 35 Am. Rep. 511; Michie, Banks and Banking, vol. 2, p. 1046; Garrison v. Union Trust Co., 139 Mich. 392, 102 N. W. 978, 70 L. R. A. 615, 111 Am. St. Rep. 407, 5 Ann. Cas. 813; Bank v. Kenney, 116 Md.

24, 81 Atl. 227, Ann. Cas. 1913B, 1337. It is conceded by the majority opinion that the respondent bank had no notice or knowledge of any kind that said deposit was of a trust fund, and that the appellant had clothed Stegner with apparent or ostensible power to dispose of said draft as if it was his own private property. If the proceeds of said draft, as represented by said cash deposit, had still been in the bank to the credit of Stegner at the time this suit was commenced, or at the time appellant gave respondent notice, of course appellant might have followed, identified, claimed and recovered the same as a trust fund, but that is not this case; the law in relation to the following of trust funds, under such circumstances, has no application to this case. In principle the facts of this case have the same legal force and effect as if Stegner, as agent, had sold plaintiff's wheat to some third party and had received the cash therefor, and then had wrongfully converted and embezzled said money by taking the same to the bank, and handing the cash over to the bank in payment of a debt he owed the bank. Under such circumstances, where the bank had no notice of the trust character of the money so received, a recovery back from the bank by the true owner, of a like sum, cannot be sustained. The principle involved in this case is the same as if a thief or highway robber had paid his individual pre-existing debt with stolen money without any notice on the part of the creditor who had received it that it was stolen money, and long thereafter the owner of the stolen money should bring suit against such creditor to recover, not the same identical money, but a like amount of money, claiming that the money with which such debt had been paid was stolen money in the hands of the thief, and that the creditor had parted with no value at the time he received such money. We are of the opinion that the original owner from whom the money had thus been stolen could not recover,—that when a creditor receives cash in payment of a pre-existing debt he is not required or bound to make inquiry as to the manner in which such debtor obtained possession of such money.

The judgment appealed from should be affirmed.

SMITH, P. J., concurs.