GEORGE W. STEERE ET AL. v. STOCKYARDS NATIONAL BANK.

No. 3757.   Decided December 5, 1923.

(256 S. W., 586.)

1.—Bank—Overdraft—Deposit of Trust Funds—Notice—Burden of Inquiry.

Where it was known to a bank that a part, one third or more, of the sums which one doing a live stock commission business had been accustomed to deposit with it from time to time to his personal credit and to check against consisted of money belonging to others, proceeds of stock sold for them on commission, such knowledge had the effect of placing on the bank the burden of making inquiry and ascertaining for itself the persons to whom trust funds so deposited in fact belonged, and to render unauthorized its offsetting their claims thereto by applying same to the depositor's debt to the bank on an overdraft. (Pp. 396-403).

ON MOTION FOR REHEARING

2.—Certified Question.

In answering a certified question the Supreme Court passes merely on a point of law, and does not determine facts. In determining that the facts herein placed the bank on inquiry as to the interest of others in the trust fund deposited with it, the Court of Civil Appeals is not precluded from determining as a fact what should be the result of that burden of inquiry on its liability to the owners of the trust fund. (P. 403).

Questions certified from the Court of Civil Appeals for the Second District, in an appeal from Tarrant County.

The Supreme Court referred the questions to the Commission of Appeals, Section B, for its opinion thereon and here adopts same as its answer thereto.

*Moses & Rowe, Bryan, Stone & Wade, Thompson, Barwise, Wharton & Hiner, McLean, Scott & McLean, Capps, Cantey, Hangar & Short, Phillips, Trammell & Caldwell, Alexander & Baldwin, Glover C. Johnson, Aubrey G. Alexander, H. C. Ray, E. S. Allen, C. M. Cureton, W. W. Cave*, and *Goree, Odell & Allen*, for appellants the shippers (some 75 in number).

The moneys in question constituted trust funds: Interstate National Bank v. Claxton, 77 S. W., 44; Id., 80 S. W., 604; Union National Bank v. Gillespie (U. S.), 34, L. Ed. 724.

Liability of bank—notice, when required, and what constitutes: Interstate National Bank v. Claxton, 77 S. W., 44; Id. 80 S. W., 604; Davis v. Panhandle National Bank, 29 S. W., 926; U. S. Fidelity & Guaranty Co. v. Adoue & Lobit, 104 Texas, 379; Kersey v. Fuqua, 75 S. W., 56; Greenaux v. Wheeler, 6 Texas, 515; Miller v. Hobdy, 159 S. W., 97; Wade on Notice, Sec. 21; 3 R. C. L., pp 550, 593; National Bank v. Life Insurance Co., U. S., 26 L. Ed. 694; Duckett v. National Bank, 38 Atl., 983; 39 L. R. A., 84; Union Stock Yards Natl. Bank v. Gillespie, 34 L. Ed., 784, 137 U. S., 411; Clemmer v. Drovers' Natl. Bank, 41 N. E., 731; Fidelity & Deposit Co. v. Trust Co., 123 N. E., 372; Santa Maria v. Bank, 242 Fed., 145; U. S. Fidelity & Guaranty Co. v. Trust Co., 228 Fed., 451.

The court erred in refusing to render a judgment for these defendants and intervenors on their cross action against the Stock Yards National Bank, for the reason that the money involved in said cross action was trust funds belonging to these defendants and intervenors in the hands of said Herbert Graves, and that said money was wrongfully appropriated and converted by said bank to its own use and benefit, by the application of same to an indebtedness due by said Graves to said bank. Interstate Natl. Bank v. Claxton, 77 S. W., 44, Id. 80 S. W., 604; Clevenger v. Blount, 122 S. W., 529; Bank v. Bank, 146 S. W., 1034; Bank v. Bank, 168 S. W., 504; 21 C. J. 1250; Bank v. Railroad Co., 161 S. W., 1145.

*Wray & Mayer*, for appellant, Steere.

*Wm. J. Berne*, for Stockyards Natl. Bank, appellee.

Our general knowledge that one-third of Graves' deposits during his four years' business career was trust money did not, as matter of *law*, put us on inquiry as to the owner of each of the 76 items composing the trust funds included in Graves' various deposits made during the

nine days in question.  Ft. Worth etc. Bank v. Harwood, 229 S. W., 487; American etc. Bank v. New York etc. Co., 148 N. Y., 698; Arnold v. San Ramon, etc., Bank, 194 Pac., 1012; Moore v. Clementson, 2 Campbell, 22; Knight v. Mason, 22 New Zealand L., 293.

If the burden in question be imposed upon us, it would be impossible for any bank to take the account of a commission man; for it would be impossible to conduct a banking business and, at the same .time, act as a detective in discovering, first, whether or not each particular item in the daily deposits was a trust money item; and, after ascer- taining that fact, then ascertain the further fact, at the banker's peril, as to the ownership of that trust item.

A shipper at a distance has no right to impose upon a banker this burden of investigating into the honesty of the shipper's own agent, and then ascertaining the ownership of the shipper's money, the shipper exercising not the slightest care and doing nothing further than ship his cattle and select his agent to handle them and the pro- ceeds.

MR. PRESIDING JUDGE POWELL delivered the opinion of the Com- mission of appeals, Section B.

This cause is before the Supreme Court upon the following certifi- cate from the Honorable Court of Civil Appeals for the Second Dis- trict:

The above entitled and numbered cause is now pending before us on motion for rehearing, and we deem it advisable to certify to your Honors for determination the questions arising therein, as herein- after set forth.

Stating the case briefly and in its chronological order, Herbert Graves was engaged in the livestock commission business on the Fort Worth stockyards during the years 1915, 1916, 1917 and until Oc- tober 5, 1918, when he failed.  He did business under the trade name of the Herbert Graves Commission Company.  At the time of his failure he had outstanding checks covering the net proceeds of cattle consigned to and sold by him, aggregating some $92,000.00  On Oc- tober 26, 1918, a petition in bankruptcy was filed against him and he was adjudged a bankrupt on November 21, 1918.  Geo. W. Steere· was appointed trustee in bankruptcy on December 9, 1918, and on October 11, 1919, filed this suit in the district court of Tarrant County, Texas, to recover from the appellee Stockyards National Bank, moneys which he alleged had been applied by the Bank to the payment of an indebtedness, by overdraft of Herbert Graves on the bank, it being alleged that such payment constituted an unlawful preference under the bankrupt laws, and was also in fraud of the creditors.

E. A. Kelley and some seventy-five others intervened in the suit and severally sought to recover from the bank sums alleged by them to

be due from Herbert Graves, as we shall hereinafter designate the Herbert Graves Livestock Commission Company, as the net proceeds of cattle shipped to and sold by Herbert Graves and deposited in the appellee bank. These intervenors, who will hereinafter be referred to collectively as shippers, alleged, in substance, that such proceeds constituted trust funds and that the bank, with knowledge of the character of the funds and with knowledge of Herbert Graves' insol-vency, had applied them to the payment of Herbert Graves' indebted-ness or overdraft.

· John Barton Payne, director general of railroads, and nine railroad companies, also intervened, claiming items of indebtedness aggregat-ing $5,206.29, alleging that the items of indebtedness were due from Herbert Graves to the several railroad companies. These interveners will be hereinafter designated as carriers. The carriers alleged that the sums claimed were severally due as freight charges; that, by the custom of business upon the yards at the time, they were not collected from the shippers, but were to be paid by Herbert Graves out of the proceeds of the cattle sold; that such proceeds, including said sums for freight, had been deposited in the appellee bank and by the bank applied to the liquidation of Herbert Graves' overdraft, with knowl-edge of the trust character of the fund.

The appellee bank denied that it had exercised or obtained an un-due preference under the bankruptcy laws, and also denied knowl-edge of Herbert Graves' insolvency, and denied that it had knowl-edge of the trust character of the funds claimed by the several inter-veners at the time it had applied the funds deposited by Herbert Graves to the payment of his indebtedness, alleging, in substance, that during the years specified, Herbert Graves did a large business, only a part of which consisted of selling cattle for others, and from time to time deposited large sums of money in the bank, and from time to time created overdrafts which were subsequently paid. And that, as already stated, at the time of Herbert Graves' failure and at the time of the application of the moneys deposited by Herbert Graves to the liquidation of his indebtedness, the bank was without knowl-edge of the trust character of the funds.

The trial was before the court without a jury, and resulted in a judgment in favor of the bank, except as to the sum of $317.85, which was awarded to the plaintiff trustee in bankruptcy. From this judgment the plaintiff trustee, the shippers, and the carriers have appealed, and the bank cross assigns error to the judgment against it in favor of the trustee for the said sum of $317.85.

The evidence is undisputed that Herbert Graves during the years 1915, 1916, 1917, and until October 5, 1918, did business on the Fort Worth stockyards as a livestock commission dealer, and that at least a part of such business was to receive consignments of cattle, sell the same, and remit the net proceeds to the shippers. He did business

with the appellee bank only, and his custom during the years stated was to make deposits in his own name with the appellee bank and remit to the shippers the net proceeds of cattle sold by him for them by his personal check, except in instances, which apparently were few, where shippers demanded exchange. The deposits included his charge for commission, freights, yardage, feed charges, etc. There is no evidence tending to show that any of the shippers named in this controversy were without knowledge of such custom or made any objection thereto. In other words, we think it must be implied that the shippers consented to such method and manner of depositing and remitting of the proceeds.

There was other evidence tending to show and sufficient to support the conclusion that Herbert Graves in the year 1915 had as much as $95,000.00 invested in the different branches of his commission business, and that later, through a government contract, he made a profit of $25,000.00 or $30,000.00  In 1915, as a basis of credit, Graves made to appellee bank a statement of the condition of his business, showing that he had $95,000.00 net, after payment of all debts, invested in it; the bank knew of aforesaid profit, and it heard of no losses thereafter. In the early summer of 1918, he submitted to the officers of the bank a financial statement which showed that he then had in the different branches of his commission business, other than that of selling cattle on commission for others and after payment of all outstanding checks, between $35,000.00 and $50,000.00 in cash, and said officers in fact believed this statement to show the true condition of Herbert Graves' business at the time. That from time to time Graves created overdrafts in the bank in considerable amounts, which, previous to the closing of his business, he had promptly met; that throughout the three years preceding his failure the selling of cattle on commission for others was but one of several branches of his business, and of the proceeds of such business deposited by him, Mr. Sparks believed that only one third was made up from the proceeds of cattle sold on commission for others; that the deposits were not so made in form or with attendant circumstances as to enable the bank to distinguish between the proceeds of cattle sold for others and the proceeds arising from other branches of his business. The bank could not tell from Graves' checks to third parties for what those checks were given.

The evidence further shows that the claims of the shippers cover the period from September 25, 1918, to October 5, 1918, and aggregate $92,889.63; that during this period, from day to day, Graves deposited the aggregate sum of $325,551.27. At the opening of business on September 30th, 1918, Graves had no overdraft, but at the close of business that day the overdraft was $45,744.69. On October 1st the deposits were $43,534.98; on that day the bank paid out, on Graves' checks to third persons, $22,421.95; and the overdraft at close of

business was $24,631.66. On October 2nd the deposits were $37,357.08, and the money paid out that day on Graves' checks to third persons amounted to $32,320.07; and the overdraft at close of business was $19,594.65. On October 3d, the deposits were $41,611.91, and the money paid out that day on Graves' checks to third parties was $34,-594.76; and the overdraft at close of business was $12,577.50. On October 4th the deposits were $41,957.83, and on that day the bank paid out on Graves' checks to third parties, $43,107.17; and the overdraft at close of business was $13,726.84. The deposits on October 5th reduced the overdraft to $5,478.58. The overdraft of Herbert Graves with the defendant bank was reduced from $45,744.69, the condition of the account on the afternoon of September 30th, to an overdraft of $5,478.58 on the afternoon of October 5th, 1918, or in a space of six days. During the above period of time there was deposited to the credit of said account $179,132.70. During that period of time the proceeds of livestock sold on commission by Herbert Graves was deposited in said bank to the extent of $153,135.21, of which amount shippers were not paid for their cattle so sold, and the proceeds so deposited in said bank to the extent of $92,889.63 being the claims represented by the Defendants Shippers in this case. During said period of time said banks paid checks drawn on said account to the extent of $138,886.55, therefore receiving $40,266.11 more on deposit than it paid out on checks, and thereby reducing its overdraft to that extent. No checks were paid after October 4th. The bank paid all of Graves' checks until October 5th, on which day knowledge of his insolvency became known to the bank and it closed his account and refused to further honor his checks.

At the time of the $45,744.69 overdraft, on September 30th, and before the overdraft was created, Mr. Sparks, president of appellee bank, conferred with both Graves and Duval, the latter being the office manager of Graves, and informed them that checks presented for payment that day would, if paid, create the overdraft, and stated that before the bank paid the checks it wanted to know what the situation was. Thereupon, both Graves and Duval informed Mr. Sparks that Graves had sold and delivered to different parties cattle that Graves owned individually, and which he had fully paid for; there was due Graves on these cattle $65,000.00 and this money was in course of transmission to Graves and would be received in two or three days and would be deposited against the overdraft. Thereupon, Mr. Sparks asked how much of this $65,000.00 would have to be paid out and thereupon Graves and Duval informed Mr. Sparks that out of these proceeds they had to issue only $8,000.00 in checks. On this statement Mr. Sparks paid the checks that created the $45,-744.69 overdraft, which was created September 30th, 1918, and, at the close of business on that day the overdraft stood at that figure.

All of Graves' checks were honored by the bank, as presented, until the 5th day of October, on which day knowledge of Graves' insolvency became known to the bank and it refused to further honor his checks. The balance of Graves' indebtedness by overdraft at that time being $5,478.58, as appears from the statement already given.

The appellee bank handled the accounts of between twenty and thirty commission men on the Fort Worth stockyards, and their accounts were frequently overdrawn. Graves' account had been overdrawn a number of times prior to the overdraft in question, and these overdrafts had been paid promptly.

Among others to whom Graves sold cattle on commission were Swift & Company and Armour & Company packers. In such cases when a sale was made to the packer's buyers, the cattle were weighed, a scale ticket made out by the weigher, upon which was designated the name of the commission firm making the sale, the name of the person in whose name the shipment had been made, the person to whom sold, with the weights, classes of cattle, etc. The name of the shipper was put on the ticket by the weigher for the convenience of the commission men and for the Stockyards Company. The following is a copy of a scale ticket executed September 30th, 1918:

Fort Worth Stockyards Co.

'No. 18204.

| 'Sold by H. G. | Lawler & T. · | Sold to Armour. | |
|---|---|---|---|
| '    Block | Calves | Weight | Price |
| '150     010 | 5 cf | 1500 | 5.50 |
| '        014 | 10 cf | 1740 | 7.00 |
| '1740   406 | 26 cf | 8120 | 7.00 |
| | 'Series E    Date 9-30, 1918 | Scale | |
| | 'No     Nor | Gray | |

'Weighmaster.'

In the above ticket Lawlor & T. were the parties making the shipment. These tickets were attached by the commission man to a slip showing the total sum due him by the packer on the attached scale tickets, and were passed to the office of the packer, and, when approved by the packer, were sent by the packer to the bank with instructions to credit the commission man with the total amount shown on the slip. These slips, with their attached scale tickets, were sent to the bank at the busiest part of the day, and, at that time, the bank handled the accounts of between twenty-five and thirty commission men and they each made daily deposits from the packers, in the form of the aforesaid slips with scale tickets attached. The bank had no concern with these scale tickets and they were not sent to the bank for its use or conveyance. On receipt by the bank of these slips, it entered on its book the credits shown by the slips and immediately returned the slips and attached scale tickets to the packer. The scale tickets were attached to the slip as a matter of convenience for the

packer.   The teller receiving these slips was   required, in the per-
formance of his duties, to look only at the net amount shown upon
the slip.   At times, the name of the shipper, on the scale ticket, was
stated or indicated by initial only; in instances the name of the
shipper as stated on the scale ticket did not indicate the true owner;
sometimes in the conduct of Graves' business he sent buyers into the
field who purchased cattle for him, which were shipped in the name of
the buying agent and consigned to Graves, and thereafter sold.

The claim of App Smith, one of the interveners, rested, in addition
to what we have already stated, upon the following further evidence:
It was shown that on the 30th of September, 1918, there was delivered
to Graves, as consignee, by the transportation companies, about 100
head of App Smith's cattle.   Herbert Graves had been commissioned
by a Mr. Hamilton of Cuero, Texas, to buy a certain number and
class of cattle for him, Hamilton.   Graves concluded that the Smith
cattle met the requirements and he bought of Smith some ninety odd
head and shipped them to Hamilton at Cuero.   Graves gave Smith his
personal check on appellee bank, which has never been paid, and drew
on Hamilton at Cuero for the price of the cattle, including his com-
mission and other charges.   Graves had been authorized by Hamilton
to draw this draft.   This draft on Hamilton was deposited and passed
to Graves' credit in the appellee bank on the 4th day of October, and
was forwarded by the appellee bank to Cuero for collection.   On
October 6th or 7th the bank at Cuero informed the appellee bank,
by wire or telephone, that Smith was claiming that he had not been
paid for the cattle and was demanding delivery of the cattle to him.
Hamilton did not question his liability on the draft.   The appellee
bank, however, insisted upon Hamilton's paying the draft, which he
agreed to do, and did do upon appellee's guaranty to save him harm-
less, and the proceeds thereupon were returned to the appellee bank
about October 9th, 1918.   It was shown in the testimony that App
Smith was in the yards at the time his cattle arrived and were de-
livered to Graves as consignee; that he knew of the transaction on the
day the cattle were sold to Mr. Hamilton; that his instructions to
Graves were to send the proceeds of the sale of cattle to the Llano
National Bank; that he told him to 'send exchange to the Home Na-
tional Bank.'   There was evidence to show, and we must hold that
the court below so found, that the appellee bank accepted the bank's
draft on Hamilton at Cuero and passed the amount thereof to Graves'
credit in good faith and in due course of business without knowledge
at the time of Graves' insolvency and without knowledge at the time
that the fund belonged to Smith or to any other person than Graves
himself.   It is inferentially true, at least, that in the transaction
Graves was acting as the Agent of Hamilton.

As relating to the intervening carriers, it was shown that upon the
arrival of the cattle on the stockyards, consigned to commission com-

panies for sale, their transportation charges were not collected from the consignors, but the commission company to which the cattle were consigned was trusted to pay such freight charges out of the proceeds of the cattle when sold, it being the custom of carriers to send a collecting agent around among the commission firms each day for the collection of their charges.

The fact that as between Graves and the several shippers, that the shippers are entitled to recover the several amounts specified by them in their pleas of intervention is not contested; in other words, it is undisputed that as between Graves and the several shippers, the shippers would be entitled to recover the several amounts by them claimed. It seems further undisputed that the aggregate amount of the claims of the shippers, considered as a class, is more than sufficient to absorb any and all amounts that were applied in the extinguishment or reduction of Graves' overdraft, and the claim of the trustee in bankruptcy semes to rest upon the fact that the item of $183.53 was credited to Graves' account after October 5th, but it was shown that this item had long theretofore been credited and the credit not discovered until an examination of the accounts after Graves' insolvency. It is also pertinent to further state, as relating to the claim of the trustee in bankruptcy, that on October 7th, 8th, and 21st the bank received from Swift & Company items aggregating $317.85, which the bank applied to the Graves' overdraft. But the evidence tends to show that these items were proceeds of the cattle sold by Graves to Swift & Company before his insolvency was known but which had not been transmitted to the bank prior to October 5th, when Graves ceased to do business.

The officials of the bank believed, until October 5, 1918, that Graves was solvent; and Graves himself, until October 7, 1918, believed that he was solvent.

As arising from the facts so stated, we propound your Honors for determination the following questions, to-wit:

1. Did the trial court err in concluding, and did this court err in sustaining the conclusion, that the bank was without constructive knowledge of the insolvency of Herbert Graves Commission Company and of the trust character of the funds applied as an offset to the overdraft mentioned prior to October 5, 1918?

2. Did the knowledge of the bank that one-third of the proceeds deposited by Graves during the course of his business was the proceeds of cattle sold by the commission company for individual shippers have the effect to place upon the bank the burden of making inquiry and ascertaining for itself the persons to whom such trust funds in fact belonged, and hence render unauthorized the offsets above shown to the commission company's overdraft?

3. If the foregoing questions be answered favorably to the bank, then were the special facts relating to the claims of the intervener

App Smith and of the packers and of the carriers or transportation companies such as to affect the bank with constructive notice of their several claims and equitable rights to which these parties were severally entitled?''

In Vol. 13, A. L. R., beginning at page 324, is a most accurate annotation stating certain principles of law relative to the questions we are now considering. The author follows the declarations of principle by citation of authorities which really sustain the principles announced.

In the first place, we are there told that ''it is universally conceded that knowledge upon the part of a bank that deposits made by a debtor in his own name belong to a third person absolutely precludes the bank from applying such funds to the individual indebtedness of the depositor to it.'' The author follows this rule with authorities from United States courts and practically all the states, including the two Texas cases of Interstate Nat. Bank v. Claxton, 97 Texas, 569, and United States Fid. & Guar. Co. v. Adoue & Lobit, 104 Texas, 379.

In the case of Bank v. Claxton, supra, Justice Williams, for our Supreme Court, discusses the rules of law regulating the relation existing between a bank and its customers as follows:

''The principles governing are clearly stated in the opinion of the Chief Justice in the case of Coleman v. Bank, 94 Texas, 607, 608, with copious citations from leading authorities. From these authorities it is clear that a depositor, although holding money in a fiduciary capacity, may draw it out of the bank ad libitum. The bank is bound to honor his checks and incurs no liability in so doing as long as it does not participate in any misapplication of funds or breach of trust. The mere payment of the money to, or upon the checks of, the depositor does not constitute a participation in an actual o · intended misappropriation by the fiduciary, although his conduct or course of dealing may bring to the notice of the bank circumstances which would enable it to know that he is violating his trust. Such circumstances do not impose upon the bank the duty or give it the right to institute an inquiry into the conduct of its customer in order to protect those for whom it may hold the fund, but between whom and the bank there is no privity.''

But, Judge Williams goes on to show that the situation above discussed is entirely different from another situation he describes as follows:

''This case is to be distinguished from those in which a bank undertakes to acquire title to, an interest in, or benefit from a fund held in trust by a depositor. In attempting to acquire such a right or benefit the bank becomes a party to the action of the trustee and stands as any other person dealing with one holding property in a fiduciary capacity. The question of notice of the title of the person holding the property and his power over it arises, and a bank can not any

more than any other person acquire that which belongs in equity to another, if it have notice of his rights; and if it thus aid a trustee in diverting trust property from the beneficiary, it becomes liable as a wrongdoer.''

In the case of Guaranty Co. v. Adoue & Lobit, supra, our Supreme Court, speaking through Judge Ramsey, *rendered* judgment for some $15,000 against Adoue and Lobit because the latter had permitted a guardian to withdraw trust funds and then take credit personally for same, later paying a personal debt of the guardian from such deposit to the said firm. Judge Ramsey said the principal question in the case was whether or not Adoue and Lobit were charged with notice of the trust character of the funds in question. Judge Ramsey ruled they were so charged with notice as a matter of law. The evidence as to notice was largely the fact that the property had been deposited in Compton's name as guardian.

Again, on page 327 of 13 A. L. R., the author lays down the following principle:

''The decided weight of authority is to the effect that where the bank in which funds in which third persons have an interest are deposited in the individual name of the depositor has neither actual knowledge, nor notice of facts sufficient to put it upon inquiry, as to the true character of the deposit, it may apply the deposit to the individual debt of the depositor.''

The rule aforesaid is followed by citation of numerous authorities.

A portion of the last quoted rule is more fully given in another rule the same author lays down as follows:

''Where the bank, although having no actual notice of the character of funds deposited with it, has knowledge of circumstances such as are regarded as sufficient to necessitate inquiry upon its part, the general rule is that the bank cannot, as against the true owner, set off such funds against the individual indebtedness of the depositor to the bank. The following cases which fall within the scope of the present annotation are illustrative of those which so hold: Union Stock Yards Bank v. Gillespie (1890), 137 U. S. 411, 34 L. ed. 724, 11 Sup. Ct. Rep., 118; Union Stock Yards Nat. Bank v. Moore (1897), 25 C. C. A. 150, 49 U. S. App., 153, 79 Fed., 705; Anderson v. Kissam (1888), 35 Fed., 699, reversed on other grounds in (1892), 145 U. S., 435, 36 L. ed. 765, 12 Sup. Ct. Rep., 960; Bank of Guntersville v. Crayter (1917), 199 Ala. 599, L. R. A. 1917F, 460, 75 So., 7; Keeney v. Bank of Italy (1917), 33 Cal. App., 515, 165 Pac. 735; Clemmer v. Drovers' Nat. Bank (1895), 157 Ill., 206, 41 N. E., 728.'' 13 A. L. R., 334.

In the case at bar, the bank had kept up with this Graves account. The officers actually knew that at least one-third of the funds being deposited by Graves belonged to his customers who had shipped him cattle to be sold on commission. Under all the authorities, the bank would not be authorized to appropriate funds which it knew belonged

to others than Graves in the payment of a personal debt of Graves to it.   Not only so, but the authorities generally are to the effect that knowledge of certain facts are sufficient to put bankers upon inquiry before appropriating money in payment of debts owing such banks by a depositor.   We are clearly of the view that the actual knowledge on the part of this bank that the Graves deposit consisted, *in part,* of trust funds placed upon the bank the burden of making inquiry before appropriating any of that deposit in payment of its own overdraft against Graves.   If all of the Graves' deposit had belonged to the shippers, within the knowledge of the bank, the latter certainly could not have appropriated any of the funds to its overdraft against Graves. The bank, knowing the deposit contained trust funds, must separate the trust funds in said deposit from the Graves funds therein before it makes an appropriation from the deposit to pay the Graves overdraft.   The funds were mixed by Graves.   The bank knew they were mixed.   Therefore, under a rule as old as the law itself, the entire deposit will be treated as trust funds except so far as the bank might, upon inquiry, be able to distinguish the trust funds in said deposit from those therein belonging to Graves personally.   In the case of Central Natl. Bank v. Connecticut Mut. Insurance Co., 104 U. S., 67, the Supreme Court of the United States quotes with approval the following:

"If a man mixes trust funds with his own the whole will be treated as the trust property except so far as he may be able to distinguish what is his own."

Before Graves or the bank could appropriate any part of the Graves deposit to the debt of Graves to the bank it was necessary that they take steps to ascertain what part of the Graves deposit belonged to Graves personally.   In other words, actual knowledge on the part of the bank that much of the Graves deposit consisted of trust funds was sufficient to put the bank upon inquiry to ascertain just what part so consisted before using any part of it in payment of Graves' overdraft to it.

In the case of Bank v. Ins. Co., supra, the bank appropriated, in payment of a debt due it by Dillon, money which the latter had on deposit with it as "general agent."   Dillon collected premiums for an insurance company and placed the premiums, including his own commissions, in the bank to the credit of himself as "general agent." It was a mixed account.   Part of it belonged to the insurance company and part to Dillon.   The Supreme Court of the United States held that the bank could not retain that portion of the money belonging to the insurance company.   It also held that the facts surrounding the deposit were sufficient to charge the bank with notice of the trust character of at least a portion of the deposit.   The court said:

"A bank account, it is true, even when it is a trust fund, and designated as such by being kept in the name of the depositor *as trustee,*

differs from other trust funds which are permanently invested in the name of trustees for the sake of being held as such; for a bank account is made to be checked against, and represents a series of current transactions. The contract between the bank and the depositor is that the former will pay according to the checks of the latter, and when drawn in proper form the bank is bound to presume that the trustee is in the course of lawfully performing his duty, and to honor them accordingly. But when against a bank account, designated as one kept by the depositor in a fiduciary character, the bank seeks to assert its lien as a banker for a personal obligation of the depositor, known to have been contracted for his private benefit, it must be held as having notice that the fund represented by the account is not the individual property of the depositor, if it is shown to consist, in whole or in part, of funds held by him in a trust relation.''

The above case is very similar to the case at bar. It was a mixed fund in each case. In the insurance company case, supra, the deposit was in the name of one as ''general agent.'' The court held that such fact, and others similar to the facts in the case at bar, brought the bank knowledge of the trust character of the funds. In the case at bar, no descriptive words were added to the name of the depositor, but this is immaterial since the bank confesses actual knowledge that the deposit contained trust funds. In the insurance company case, the bank had to disgorge. And, in our judgment this bank, in the case at bar, should be required to do likewise.

In the case of Union Stock Yards Bank v. Gillespie, 137 U. S., 411, the United States Supreme Court, in an able opinion by Judge Brewer, says:

''Rappal, Sons & Co. were in the commission business—known to the bank to be in that business. They were not buyers and sellers, but factors—agents to sell. Presumably, therefore, moneys deposited by them were the proceeds of cattle consigned to them for sale. Their business being known to the bank, such presumption goes with their deposits; and while not of itself notice, is a circumstance to compel inquiry on the part of the bank in respect to any particular deposit. We do not mean to be understood as implying that a bank receiving deposits from one whom it knows to be in the commission business receives every deposit in trust for any unknown principal. A bank is not sponsor for all its depositors, although it may know the character of their business. Its relations to its depositors are those of debtor; and, generally, receiving and paying out money on the checks of its depositors, it discharges the full measure of its obligations. It is not ordinarily bound to inquire whence the depositor received the moneys deposited, or what obligation such depositor is under to other parties. It is only when there gather around any deposit, or line of deposits circumstances of a peculiar nature which individualize that deposit or line of deposits, and inform the bank of peculiar facts of equitable

cognizance, that it is debarred from treating the deposit as that of money belonging absolutely to the depositor."

Judge Brewer, near the conclusion of his opinion, referring to the insurance company case from which we have heretofore quoted, said:

"The case in 104 U. S., with the authorities cited in it, is decisive of this. The legal title to these moneys deposited was in the Rappals; so it was in that case in Dillon. The beneficial ownership is in the Gillespies; there it was in the insurance company. The circumstances surrounding the deposits, and the relations between the depositor and the bank, were such as to impart notice to the bank that the beneficial ownership was outside of the legal title. With that notice, it had no right to appropriate the deposits to pay the obligations of the depositor to the bank, but it was properly adjudged liable in a suit in equity, and in that alone, to the claims of the beneficial owner. Here the beneficial owner was the Gillespies; the legal title was in the Rappals; but when they deposited with the bank, the latter received the money with notice that the beneficial ownership was elsewhere than in the Rappals. It could not in equity take them and cancel their private debt to it."

In the case of Union Stock Yards Natl. Bank v. Moore, 79 Fed., 706, the Circuit Court of Appeals says:

"The right of the appellees to recover of the appellant the moneys claimed by the appellees in this suit depended upon the litigated questions of fact, whether the appellees were in equity the owners of the money claimed by them at the time the same was deposited by said company in said bank, and whether the officers of said bank, when it received such deposit, knew, or had reason to believe, that the deposit *consisted of or contained* moneys not belonging to said company, but to the appellees, or to others for whom the company was but the agent or factor. Clemmer v. Bank (Ill. Sup.) 41 N. E. 728; Bank v. Gillespie, 137 U. S. 411, 11 Sup. Ct. 118. The court found these facts in favor of the appellees, and, from a careful consideration of the evidence, we are satisfied with the correctness of such finding. The decree appealed from is affirmed, with costs." (Italics ours.)

In the very recent case of Bank v. Crayter, 199 Ala., 599, the Supreme Court of Alabama said:

"The bank either knew absolutely or was chargeable with notice that the moneys or funds so deposited by Burke were not the property of Burke, but that of some principal or client of his; and the notice was such that, if the bank had followed it up with due diligence the inquiry would have elicited the truth of the matter."

We also quote as follows from Wade on Notice, Sec. 21:

"Where the purchaser had knowledge that the property had been purchased by persons who were executors of a will and mentioned as such in one of the deeds forming a link in the chain of title, together with knowledge that such executors hold in trust a large estate with

unlimited authority to purchase real estate, this was held sufficient to charge the purchaser with notice of the fact that the property purchased was held subject to the trust, upon the principle that being possessed of knowledge of distinct facts affecting the title of his contemplated purchase, he could not close his eyes and screen himself under the plea of ignorance of other facts connected with those already known to him. Good faith rendered it incumbent upon him to make reasonable inquiry, and he took the title charged with the trust of which such inquiry would have informed him.''

This is an equitable proceeding and we can perceive no reason in equity why the shippers of these cattle should be called upon, out of their own private funds, to liquidate some $40,000.00 of the overdraft which Graves created in the bank about six days before he failed. The undisputed facts, in the certificate, show that the bank was doubtful about permitting this overdraft of some $46,000.00. Its President called on Graves for an explanation before doing so. The conference shows beyond question that the bank, at that time, knew that most of the Graves deposits were in trust for others. But Graves told the bank President that he had sold cattle of his own for $65,000.00 and that the proceeds of such sale would be in within two or three days; that only about $8,000.00 of that amount belonged to others; that the remainder would easily care for the overdraft of some $46,000.00. Thereupon the President permitted the overdraft. But, alas, the $65,000.00 was not forthcoming. Still, is that any reason why the shippers should make good the default of Graves in that promise by paying it themselves? They did not tell the bank to believe the promises Graves made it. The bank evidently did believe Graves when he promised the $65,000.00. If it was a victim of its own inability to judge of men in permitting them to create overdrafts, the shippers should not be called upon to pay for such misplaced confidence.

But, counsel for the bank argue that if we answer the second question in the affirmative, we will place a great burden upon the banks in handling accounts of commission merchants. We do not think so. We only require that they do not pay to themselves funds which they know, or should know, are trust funds. If this causes some inconvenience, such inconvenience would still seem to us preferable to a rule which would require one man to pay another's debts without receiving any value therefor. The bank could avoid such inconvenience itself by requiring security before permitting overdrafts. In fact, the very practice of permitting overdrafts is always necessarily fraught with danger. It is like selling merchandise on credit. If it is practiced, the creditor must accept his losses and not be permitted to reimburse himself from the funds of others.

In answering the certified questions here propounded, we are not called upon to go as far as many of the authorities have gone in this connection. For instance, on page 330, 13 A. L. R. we read:

"In a number of cases it has been held that a bank, even though it has no knowledge, either express or implied, that another than the depositor has an interest in funds deposited in his own name, cannot apply such funds to the individual indebtedness to it of the depositor, where such lack of knowledge has not resulted in any change in the bank's position and no superior equities have been raised in its favor. Bank of Metropolis v. New England Bank (1848), 6 How. (U. S.), 212, 12 L. Ed., 409; Cady v. South Omaha Nat. Bank (1896), 46 Neb., 756, 65 N. W., 906, on rehearing in (1896), 49 Neb., 125, 68 N. W., 358 (but see Globe Sav. Bank v. National Bank (1902) 64 Neb., 413, 89 N. W., 1030, as discussed infra this subdivision); Shotwell v. Sioux Falls Sav. Bank (1914), 34 S. D., 109, L. R. A. 1915A, 715, 147 N. W., 288; Davis v. Panhandle Nat. Bank (1895), 29 S. W., 926."

In the case of Shotwell v. Sioux Falls Saving Bank 34 S. D. 109, L. R. A. 1915A, 715, the court goes on to say:

"We deny that there is any recognized principle of law, or even any reason founded upon that necessity which is said to know no law, that will sustain either the justice or necessity of holding that, when a fund, even though it consists of money, can be fully and clearly traced into the hands of one who has neither paid a valuable consideration therefor nor changed his relation to the person from whom the fund was received so as to give rise to any equitable defense against the claims of the true owner of such fund—when one man has money which in equity and good conscience belongs to another—such fund should not be recovered by the equitable owner thereof. Applying, without limitation, the rule contended for by respondent, would permit a bank to retain, as against the true owner, money procured through highway robbery and deposited by the robber to meet an overdraft— a case where, upon the one side, the money is procured through no confidence or trust placed in the wrongdoer, while upon the other side, the money is received from the wrongdoer whom the bank has allowed to become indebted to it; not a case where the law must determine as between two persons who have placed confidence in a third, and where it might be said that he who confided most must suffer. We refuse to adopt any rule that must lead to such results."

We are convinced that the second question propounded by the Court of Civil Appeals herein should be answered in the affirmative. We so recommend.

In view of the recommendation just made with reference to the second question certified, we deem it unnecessary to recommend an answer to either of the other two questions certified. The third ques-

tion was propounded only in the event the other two be answered favorably to the bank. On the other hand, the answer to the second question settles the case more strongly in favor of the appellants than could any answer we might recommend to the first question certified. In other words, actual knowledge in part and duty of inquiry in part, in this case, are more effective in rendering the bank liable than any constructive notice could be. Therefore, we recommend no answer to the first or third question certified.

Opinion of the Commission of Appeals in answer to certified questions adopted and ordered certified to the Court of Civil Appeals.

Chief Justice Cureton not sitting.

THOS. B. GREENWOOD,
Associate Justice.
WILLIAM PIERSON,
Associate Justice.

### ON MOTION FOR REHEARING

We have carefully considered motion for rehearing filed herein by appellee. We think the same is without merit and recommend that it be overruled.

In the first ground of motion for rehearing, counsel for the Bank contend that the Court of Civil Appeals, in propounding the second certified question, went no further than to ask if the Bank, with knowledge that one-third of the Graves' deposits were trust funds, was put upon inquiry to ascertain whether the rest of the deposits were of that character before applying the deposit to a personal debt of Graves to the Bank; that the Court of Civil Appeals did not intend to hold, in propounding that question, that such an inquiry would have rendered unauthorized the offsets from such deposit to the overdraft of Graves to the Bank. In response to this contention, we merely dseire to say that the wording of the question in the case indicates rather clearly to us that the Court of Civil Appeals had decided that inquiry by the Bank would have ascertained the trust nature of the deposit and rendered the application to Graves' overdraft unauthorized. But, it is immaterial to us what the Court of Civil Appeals thinks of the facts. In answering a certified question, the Supreme Court is merely passing upon a point of law and not a question of fact. We have answered this question in the affirmative and held that, knowing the deposit contained trust funds, the bank was put upon inquiry to ascertain what part of such deposit consisted of such trust funds before paying a personal debt of Graves to itself out of that deposit. Upon receiving this answer, we are sure the Court of Civil Appeals will then pass upon the *facts* in connection therewith, fully and freely and uninfluenced in any way as to the facts by what we have said. The Supreme Court has no desire to invade the jurisdiction of the Court

of Civil Appeals in exercising its prerogatives in passing upon fact questions, and it will not pass upon such questions until they are before it in such a.way as to be clearly within its jurisdiction.

BEN H. POWELL,
Presiding Judge.