HIGHLANDS INSURANCE
COMPANY, Appellant,

v.

Mildred Janice YOUNGBLOOD,
Appellee.

No. 09–91–039 CV.

Court of Appeals of Texas,
Beaumont.

Dec. 5, 1991.

Rehearing Denied Jan. 9, 1992.

(1) The employee is directed in his work to proceed from one place to another, and the injury occurred while he was so travelling, or

(2) The employee is authorized, expressly or impliedly, by his employment contract to travel in the performance of his duties and the injury occurred while he was so travelling."

The issue on appeal is whether there is sufficient evidence to support the "Yes" answer. The appellant basically contends in substance that there was no fact issue to be submitted to the jury, and that there was no evidence or insufficient evidence to support the verdict of the jury and the judgment of the trial court. The standard, well-established rules of determining the "no evidence" points of error and the "insufficiency of evidence" points of error have been borne in mind.

The employer set forth a "Fiber Products Operation Position Guide"; the guide applied to Youngblood's position, responsibilities, duties, and obligations. The Position Guide provided for basic functions, general overview responsibilities, and in a separate paragraph, specific responsibilities and duties. One of Lloyd Youngblood's specific responsibilities and duties was to "take all action necessary to insure reliable service to the mill on an as required basis." This meant that the service of the mill shall not be interrupted for any reason within Youngblood's power to control seven days a week, 24 hours a day, 365 days a year. The deceased was to be available for call at all times. Probative evidence of force and value exists that no one but Lloyd Youngblood himself determined whether Lloyd Youngblood would return to the plant and for what reason he would return after the ordinary work day had been concluded. Youngblood had returned to the plant, being the mill, a number of hours after his normal working hours, or normal working day, had been completed. His normal working day was 7:00 a.m. to 4:00 p.m. Lloyd's decision about whether he needed to go back to the plant was strictly his own decision. He needed no approval from anyone for that judgmental

Clayton E. Dark, Jr., Lufkin, for appellant.

John H. Hannah, Jr., Austin, Claude E. Welch, Welch & Ward, Lufkin, for appellee.

Before WALKER, C.J., and BROOKSHIRE and BURGESS, JJ.

## OPINION

BROOKSHIRE, Justice.

Workman's Compensation case. Death Case.

Question number one was submitted to the jury; it reads:

QUESTION NUMBER 1:

Was Lloyd Youngblood in the course and scope of his employment for Temple–Eastex at the time of his fatal accident on February 10, 1988?

Answer "Yes" or "No."

ANSWER:Yes

"An injury occurring during the course of transportation is not in the course of employment, unless:

action. One witness testified that when a problem arose out at the plant that involved Lloyd's jurisdiction, responsibilities, or duties, or was under his area of supervision; then it was the decision of Lloyd, and his decision alone, as to whether it was necessary or proper for the employee (Youngblood) to go back to the plant after the close of the normal working day.

The mill or plant contained a chip bin and on the occasion in question a large quantity of long, stringy chips, were placed in the bin or mechanism. These types of chips simply would not go through the line. The record reflects it was Lloyd's area of responsibility to go back to the plant for that type of operational problem and that his actions and decisions to do so fell within Lloyd's exclusive realm of his own responsibilities, duties, and decisions about such matters. The record amply contains such relevant testimony. Also it was no one else's responsibility or duty save Lloyd's.

Simply put, it was Lloyd's sole responsibility and decision to return under the Position Guide. Lloyd had a radio which had been issued to him by his employer. The employer had the title to and owned the said radio. Lloyd possessed the prerogative and power to make the decision—being his own decision—about whether the reported problems at the mill were serious enough, or severe enough, to warrant his return. Youngblood was notified of the problem when he was at his home. There existed repeated and repetitious testimony and evidence that it was Lloyd's call and Lloyd's decision if a problem arose as to whether he came back to, or returned to, the mill after the normal working day had concluded. Lloyd had full authority under this record to call himself back to the mill or plant pursuant to the custom and in obedience to the Position Guide. Simply put, he was to take all action necessary to keep the mill running in an efficient manner around the clock 365 days a year.

### The Position Guide

The Position Guide, above referred to, provided that Youngblood "will use all means available to him to insure that chips

are free of tramp materials" and that "he will not allow the mill to be hit with slugs or oversized chips either of which can be detrimental to the operation." Basically, Youngblood was responsible for chip quality used in the mill's bins. He was further responsible for the correct mixture of chips. These responsibilities, obligations, and duties were clearly set forth in the Position Guide applicable to Youngblood.

The Position Guide enunciates these diktats:

1.) Take all action necessary to insure reliable service to the mill on an as required basis. This means that service shall not be interrupted for any reason within his power to control, seven days a week, 24 hours a day, 365 days a year.

. . . .

b.) Fully utilize his people to insure a clean safe operation as outlined by the Temple Management Program.

. . . .

f.) The Woodyard Supervisor or someone designated by him will be available for call at all times. He will keep the Wet End informed concerning who is on call.

2.) The Woodyard Foreman is responsible for all chip inventories as detailed below.

. . . .

c.) He is responsible for chip quality. Through cooperation with the Technical Department, he will insure a regular quality testing program and maintain accurate records of this data. He is further responsible for the correct mixing of chips as supplied to the mill. He will not allow the mill to be hit with slugs of fines or oversized chips either of which can be detrimental to the operation. *He will use all means available to him to insure that chips are free of tramp materials.* (Emphasis Ours)

### The Portable Radio

The furnished radio was approximately six inches tall and about two and a half inches wide. Youngblood carried this radio

attached to his belt or in his pocket. The record clearly reflects that Youngblood carried this radio with him everywhere he went. He carried the radio when he went to the movies for example, because that was his efficient way of keeping contact with the mill and of knowing what was going on and of discharging his responsibilities and duties to his employer at the mill. Our necessary conclusion is that Youngblood was in the furtherance of the business and affairs of his employer and that his fatal injury arose out of his employment. He definitely had this company owned radio with him when he was at home during the evening and after supper hours.

### The Evening or Night in Question

Sometime around or shortly after 8:30 p.m. of the evening or night in question, Youngblood received a telephone call. An employee at the plant wanted to talk to Youngblood. Shortly after the telephone conversation his radio came on, and Lloyd heard voices coming over the radio. The voice of one Bobby Lovell was identified. The voice of Lovell coming over the radio was saying that the chips involved were long and stringy—these same defective, clogging chips were making inoperative a part of the mill. A comment was made that a major effort had been made to correct the problem and that effort had not worked. There was comment that strips and chips were long and stringy also. Again, the voice said that they could not make something work at the mill.

After these radio communications, Youngblood decided to use the telephone. He called the plant. Sworn testimony exists that he was going back to the plant to inspect the shutdown or problem.

### Lloyd's Work Habits at Night

It was not unusual for Lloyd to return to the plant at nighttime if a problem arose; he did not go out to the plant every night, however. Lloyd Youngblood was definitely the overall supervisor of the operation involved at the Fiberboard Plant in the problem area, being described as where the down bin was in the chip yard. Bobby Lovell had some minor, inferior responsibility there, but the overall superior supervisor for that operation was Youngblood. Additional evidence of probative force and valuation is contained in the record. In our opinion this employee had been directed (by the Position Guide, approved custom, actual, authorized practice) to proceed from his home to the plant under the circumstances in question and that the injury and death occurred while he was so traveling; and further Youngblood was authorized both expressly and by necessary implication by his employer to discharge his duties and responsibilities to travel in the performance of his duties, and that the fatal injury in question occurred while he was so traveling back to the plant to solve a serious or severe problem in operations.

We perceive the record as clearly demonstrating that the appellee was an employee of Temple–Eastex. He performed numerous services for his employer and received compensation therefore. Therefore, a contract for hire, in common parlance, existed albeit probably an employment contract at will. The Position Guide, we conclude, was an important, pragmatic, integral and directive part of Youngblood's employment. It obviously was in a printed, written form. We conclude, then, this employee was directed by his work-rules (if a serious, severe problem arose at the mill) to proceed from one place to another and further, that this employee was authorized expressly and impliedly by his contract of hire to make this trip to the plant in the performance of his duties and obligations and responsibilities.

That is to say, to make this trip or run back to the plant to efficiently, correctly and speedily correct the special serious, severe problems that had arisen concerning the defective chips and the resulting downed machinery. Lloyd was on the direct route to the mill. He was available and on call 24 hours a day. Because some of the radio messages received by Youngblood were unclear, he was compellingly motivated to telephone the plant. The trip back to the plant was made after 8:30 p.m. of a February night. It was dark. This

condition certainly tended to increase the hazard to the motorist-employee over that of the general public simply going to work during normal daylight hours. One witness cogently testified that it was definitely in the dark of night when the stringy, too-long chips and other defective chips had created a serious problem in the bin and the bin could not be unloaded without taking the plates off. Perhaps, hopefully, a removal of the knives from the feeder would solve the problems if the long, stringy chips could be blown through the line. Hence, an unplugging situation resulted. In order to have a clear conversation and a meaningful communication, the employee decided to make a telephone call to Youngblood. The record reflects that at once Lloyd had sent word to one Jesse for Jesse to put the coffee pot on because he, Lloyd, was coming to the plant. That specific communication was definitely given to Jesse Lewis.

We perceive no evidence of either a deviation or departure.

We hold Lloyd was in the course and scope of his employment when his fatal automobile collision occurred by reason of his duties, and responsibilities.

The record is replete that the problems were serious and severe and that there was plugging up of the feeder system that grinds the chips. These uncontroverted facts were testified to by several knowledgeable witnesses who were actually on the scene. A credible body of evidence also exists that some of the other supervisors had recommended to employees that Lloyd Youngblood be called and notified about this serious problem involving the stringy, long, defective chips.

Admittedly some inconsistencies and even conflicts are present in the evidence. We must point out however, that it was within the jury's province, prerogative, and power to resolve any conflicts and inconsistencies. That function is the exclusive role of the jury.

The duties and responsibilities were, in practical actuality, incumbent upon Lloyd to go to the plant, to appraise the problem, and to solve the problem. His job descrip-

tion, being a part of his contract of employment, dictated his action of returning to the plant long after 3:30 or 4:00 p.m.—the return being in the dark of a February night. A forceful but very typical explanation of Youngblood's responsibility is reflected succinctly in the record as follows:

Q Those kind of problems, I guess, were left exclusively to Lloyd Youngblood?

A That is right.

Lloyd Youngblood was in a very important sense a self-starter in the course and scope of his employment because in his area of supervision it was Lloyd's own and sole decision as to whether or not it was necessary and reasonable for Lloyd to go back to the plant. We find:

Q Whenever there's a problem out at the plant that involved Lloyd's jurisdiction, the words you used, or under his area of supervision, whose decision was it as to whether or not it was necessary for Lloyd to go to the plant?

A His own.

Additionally, Lloyd Youngblood wanted to return to the plant to definitely identify the suppliers of these defective chips. Further, that if there were some more defective chips from these inefficient troublesome suppliers, then Lloyd would have wanted the unloading process to be shutdown so that the serious problems would not be aggravated and enhanced. The statement of facts contains this important evidence. The problem was a severe one at the time a process at the mill was slowed and eventually shutdown.

### The Criteria of Intermediate Appellate Review

A court of appeals in reviewing and analyzing a "no evidence" point of error should and must consider only the evidence, testimony and reasonable inferences therefrom supporting the jury's special verdict or answers. We should disregard evidence, testimony and inferences that are adverse to the jury's answers. We are obligated to uphold the jury's verdict if there is any evidence of probative value to

support the same. *Sherman v. First Nat'l Bank*, 760 S.W.2d 240 (Tex.1988); *Larson v. Cook Consultants, Inc.*, 690 S.W.2d 567 (Tex.1985); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951); Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 TEXAS L.REV. 361 (1960); Garwood, *The Question of Insufficient Evidence on Appeal*, 30 TEXAS L.REV. 803 (1952).

 The accepted standard of review for an "insufficient evidence" point of error requires the appellate court to consider, analyze, and weigh all of the evidence. If the record reflects evidence of probative valuation and force sustaining the jury's verdict, we are obligated to overrule such "insufficiency" point of error. We are empowered to set aside the jury's verdict and the judgment if, but only if, the same are clearly wrong and manifestly unjust. *In re King's Estate, supra; "No Evidence" and "Insufficient Evidence" Points of Error, supra; The Question of Insufficient Evidence on Appeal, supra.*

Hence, Appellant's no evidence point and insufficiency evidence point, points of error 5 and 6, are overruled. By like reasoning, we overrule appellant's point of error number 7 that the jury's answer was against the great weight and preponderance of the evidence.

From our analysis and reasoning above, we find no error in the trial court's denying appellant's motion for summary judgment, motion for instructed verdict, in overruling appellant's motion for judgment N.O.V., and in overruling the motion for new trial. The judgment below is affirmed.

This instant case of Mildred Youngblood is easily distinguishable from *State, Dept. of Human Services v. Penn*, 786 S.W.2d 28 (Tex.App.—Beaumont 1990, writ denied). Lloyd Youngblood was: (1) traveling to the mill on a special mission, (2) considerably after normal working hours, (3) at nighttime in February, being obedient to and carrying out the diktats of his Position Guide, (4) endeavoring to solve the serious and severe problem of overly long, stringy, defective chips, (5) acting as authorized by his employment contract, or contract of hire, (both expressly and impliedly), (6) taking and traveling on a direct route to the mill having told his subordinate to put the coffee pot on, and that he (Lloyd) would be at the mill shortly, (7) acting in response to messages sent over the portable radios as well as a telephone call, (8) being exposed to extra driving hazards because of the dark February night, (9) acting and working in the service of the mill so that the mill would operate efficiently and reliably so that the service of the mill would be reliable and would not be interrupted seven days a week, 24 hours a day, 365 days a year for any reason whatsoever within Lloyd Youngblood's power to control or affect, (10) available for call to duty and his work at all times.

AFFIRMED.