MAURICEVILLE NATIONAL
BANK, Appellant,

v.

Harvey ZERNIAL, D/B/A Zerco Paint
Company, Craft Systems, Inc., Bellard's
Drapery, Inc., CSW Supply, Inc., Cobb
Air Conditioning, Inc., and Rucker
Building Supply, Inc., Appellees.

No. 09–93–009 CV.

Court of Appeals of Texas,
Beaumont.

Submitted Feb. 24, 1994.

Decided July 14, 1994.

Rehearing Overruled Oct. 6, 1994.

Thomas J. Sibley, Richard J. Clarkson, Reaud, Morgan & Quinn, Beaumont, for appellant.

Terry Wood, Crutchfield, DeCordova & Chaveaux, Mel W. Shelander, Ethan L. Shaw, Moore, Landrey, Garth, Jones, Burmeiser & Hulett, Beaumont, for appellees.

Before WALKER, C.J., and BROOKSHIRE and BURGESS, JJ.

## OPINION

WALKER, Chief Justice.

This case comes to us from the 163rd District Court in and for Orange County, Texas, Honorable David Dunn, presiding. The trial court entered judgment based upon a jury's verdict against appellant for actual damages in the amount of $12,731.44; exemplary damages in the amount of $200,000; court costs in the amount of $392.60; prejudgment interest in the amount of $3,456.67; and post-judgment interest on the total amount of the judgment at the rate of ten percent (10%) per annum until paid.

Appellees in this case are Harvey Zernial, D/B/A Zerco Paint Company, Craft Systems, Inc., Bellard's Drapery, Inc., CSW Supply, Inc., Cobb Air Conditioning, Inc., and Rucker Building Supply, Inc., hereinafter referred as appellees or plaintiffs. The sole appellant in this case is Mauriceville National Bank, hereinafter referred to as appellant or defendant or Bank.

Factually, in 1989 appellees were sub-contractors of Blount Construction, Inc., (hereinafter referred to as "Blount"), on a certain construction and renovation project for a Mid–County Law Firm of Provost, Sheldon, Steele, Hughes, Giblin, Branick & Wimberly ("Provost–Sheldon"). On or about December 13, 1989, Blount deposited a check from Provost–Sheldon in the amount of $57,894.32 into an account at appellant's Bank. This check represented payment for renovation work performed at the offices of Provost–Sheldon. Blount was the general contractor on that job and appellees were all sub-contractors of Blount. The $57,894.32 check was remitted to Blount as payment for work done under Blount's contract with Provost–Sheldon, and was deposited by Blount into one of his accounts with appellant, specifically account number 001–909. A significant part of these funds were later paid to Blount's sub-contractors.

Mr. Ed Lampman, then President of Mauriceville National Bank, testified that on December 15, 1989, two days after the large deposit was made in the Blount account, that he Lampman, had a telephone conversation with Mr. Blount regarding this deposit. Mr. Lampman testified that Mr. Blount authorized the bank to debit account 001–909 for enough money to bring current the interest outstanding on a certain $150,000 promissory note executed by Blount in favor of appellant, Bank. According to Lampman, the Bank then debited account 001–909 in the sum of $6,900 to cover past due interest. Defendant's Exhibit 8, admitted into evidence, titled, "Phone Conversation Record," states "I asked Mike if large deposit made on 12/13/89 was the receivable he had been waiting for to pay interest current on all notes. He advised that it was, and advised me to debit acct for enough $ to pay all interest current."

It is appellant's contention that Mr. Blount never instructed Mr. Lampman to hold the remaining funds in account 001–909 in trust for Blount's unpaid sub-contractors. Interestingly, on the same date of this telephone conversation, Mr. Blount sent a letter captioned "To Suppliers and Sub-contractors of Blount Construction, Inc.," regretfully informing those parties that as of December 18, 1989, Blount would no longer be conducting business. On December 18, 1989, appellant placed a "hold" on account 001–909 and refused to honor checks drawn on that account.

On January 2, 1990, legal counsel for some of the unpaid sub-contractors on the Provost–Sheldon job, forwarded a letter notifying appellant that funds held in account 001–909, "were in the nature of a trust account for Materialmen and Laborers...." Despite this notice, appellant not only refused to release the "hold" on this account, but further, after notice, on March 6, 1990, debited the balance of said account ($12,175.88) and applied this money to Blount's past due note. For clarity, we shall refer to this act by appellant as an "off set" by appellant to secure its own interest.

Appellant contends that it had no duty to investigate its right to place a "hold" or to "off set" the Blount account. Appellant further contends that it had no knowledge that Blount used account 001–909 for payment of sub-contractors and materialmen. Appellant positions that much of its lack of knowledge regarding the Blount account results from the fact that appellant, is such a small bank no bookkeeping is done by the Bank, such that all actual checks for deposit are sent from the Bank to another bank (First City in Beaumont) for bookkeeping and processing. Appellant further contends that there is no evidence that the Bank's actions were done willfully, maliciously, and with reckless disregard for plaintiffs' rights in the property.

The record reflects that appellant did in fact know that Blount was a general contractor, and that Blount used account 001–909 to pay its sub-contractors and materialmen. Deon Thornton, President of Mauriceville National Bank at the time of trial, testified that the Bank had knowledge that Blount used account 001–909 to pay sub-contractors and materialmen. It is readily apparent from the record that appellant not only knew of the nature of the Blount account but chose to ignore potential legal implications by placing first, a "hold" on the account and then, after notice, determining to "off set" the balance of such account to its own benefit.

Regarding appellant's notice that Blount account 001–909 was an account used to pay sub-contractors and materialmen, Mr. Howard Gafford, a sub-contractor testified as follows:

Q  Mr. Gafford, can you identify that, please, for the jury?

A  This is a check for $2,700.00, which probably matches our first invoice for $2,700.00, drawn on Mauriceville Bank, mailed to us on—it's dated 12–15 and we got it probably on the 16th or 17th.

Q  Did you receive it in the ordinary course of business?

A  Yes, ma'am.

Q  Is it an exact duplicate of the check that you received?

A  Yes, ma'am.

Q  Was the check altered in any way?

A  No, ma'am.

Q  Now, you said that the maker was Blount Construction?

A   That's correct.

Q   What did you do when you received the check?

A   I had my wife take the check to the bank the day that we received it.

Q   Is she an officer of Cobb Air Conditioning?

A   She's the secretary-treasurer of Cobb Air Conditioning.

Q   Does she have the authority to exact transactions on Cobb Air Conditioning?

A   She can do just about anything that I can do, yes, ma'am.

Q   And do you know what happened when she arrived at the bank?

A   She showed up at the bank with the check and she was refused payment on the check.   They—

.        .        .        .        .

Q   Did your wife return home with the check?

A   Yes, she did.

Q   Do you know for a fact that she went to the bank?

A   Yes, I do.

Q   And was the check cashed?

A   No, ma'am, it wasn't.

Q   So, what did you do when your wife returned with the check?

A   I called the bank and talked to someone there and they told me that—

.        .        .        .        .

Q   When   the   person   answered   the phone—did someone answer the phone?

A   Yes, ma'am.

Q   Did they identify themselves as being the bank?

A   Yes, ma'am.

.        .        .        .        .

Q   Did you tell him who you were?

A   Yes, I did.

Q   Did you tell him why you called?

A   Yes, I did.

Q   Did you tell him—did he know which check you were talking about?

A   I don't know about the particular check.   He didn't—I don't know that he knew about this particular check, but he did tell me that—

.        .        .        .        .

Q   Did the bank know that you did work for Blount Construction?

A   We got a lot of checks from Blount Construction, so I would have to assume so, yes.

Q   When you talked to the person on the phone, did you tell them whose account the check was on?

A   Yes, ma'am.

Q   You told them it was Blount Construction?

A   Yes, ma'am.

Q   Did you tell them . which account—

A   I didn't—

Q   —account number?   Did they ask you?

A   I don't recall that, to tell you the truth. I don't know.

Q   Did you ask them why they dishonored the check?

A   Yes, I did, and they told me that there was a hold, or they were not paying funds on the account—

Appellant's response to this testimony came through Bank President Deon Thornton who testified that the Bank did receive some telephone calls, but could not specifically recall who the calls were from.   Apparently the Bank made no "Phone Conversation Record" of these calls, as was the case regarding the Lampman/Blount conversation.

The trial court submitted four questions to the jury along with instructions.   Jury Question No. 1 inquired "Do you find from a preponderance of the evidence that Mauriceville National Bank converted funds from Blount Construction, Inc.'s, account number 001–909?"   The Jury Answered "Yes." Question 2 inquired, "Do you find from a preponderance of the evidence that a constructive trust should be imposed on the funds removed by Mauriceville National Bank from Blount Construction, Inc.'s, account number 001–909?"   The jury responded, "Yes."   Jury Question No. 3 asked, "Do you. find from a preponderance of the evidence that Mauriceville National Bank acted

wilfully, maliciously or with gross negligence when Mauriceville National Bank set off or removed the funds deposited in Blount Construction, Inc.'s, account number 001–909?" The Jury Answered "Yes." Jury Question No. 4 asked, "What sum of money, if any, should be assessed against Mauriceville National Bank as exemplary damages?" The jury responded with the numerical figure of "$200,000.00."

Appellant brings six points of error, all of which proffer either a "no evidence" or a "factual insufficiency" attack upon the trial court judgment.

■ Appellant's point of error one alleges that there is no evidence to support the jury's answer to Question No. 1. In reviewing a "no evidence" point of error, this Court shall consider only the evidence, testimony and reasonable inferences therefrom which support the jury's answers, thereby disregarding evidence, testimony and inferences that are adverse to the jury's findings. We are obligated to uphold the jury's verdict if there is any evidence of probative value to support the verdict. *See Orozco v. Sander,* 824 S.W.2d 555, 556 (Tex.1992); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951); *Highlands Ins. Co. v. Youngblood,* 820 S.W.2d 242, 246 (Tex.App.—Beaumont 1991, writ denied).

■ We now review the evidence in light of substantive law applicable thereto. Money is converted by a bank if the bank, with knowledge of the trust character of the money, applies same to reduce or "off set" a debt owed to the bank by the depositor. *Security State Bank v. Valley Wide Elec.,* 752 S.W.2d 661, 665 (Tex.App.—Corpus Christi 1988, writ denied); *Houston Nat. Bank v. Biber,* 613 S.W.2d 771, 775 (Tex.Civ. App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.). Where there is actual or constructive knowledge by the bank regarding the trust nature of funds, the bank is prohibited from using such funds to "off set" other debts of the depositor. *Allied Bank West Loop v. C.B.D. & Assoc.,* 728 S.W.2d 49, 58 (Tex. App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.). A bank is without authority to seize funds held for the benefit of third parties, thereby applying those funds to an indebted-ness of the depositor, where the bank has knowledge, or by reason of circumstances, should have knowledge of a third party's right to those funds. *See Continental Nat. Bank v. Great American Mgt. and Inv., Inc.,* 606 S.W.2d 346, 348 (Tex.Civ.App.—Fort Worth 1980, writ ref'd n.r.e.).

■ In the present case the jury determined that the funds in question, in account 001–909, were converted by appellant. The evidence is clear that appellant knew, or should have known, that it held the funds in account 001–909 for the benefit of third parties. The mere posturing that appellant is a small bank unable to handle its own book-keeping, is no defense to the bank's substantive legal obligations. We find no error in the trial court's overruling of the bank's motion for judgment notwithstanding the verdict or in the alternative, appellant's motion to disregard certain jury answers based on appellant's "no evidence" challenge.

Point of error two attacks the trial court's overruling of the bank's motion for new trial on "factual insufficiency" grounds.

■ Our standard for reviewing appellant's insufficiency points of error require that we consider all of the evidence in the case, and may only set aside the jury's verdict should we find that such verdict is so against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *See Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *In re King's Estate,* 244 S.W.2d at 661; *Miles Home Div., Insilco Corp. v. Smith,* 790 S.W.2d 382, 383 (Tex.App.—Beaumont 1990, writ denied). Intermediate appellate courts are "not free to reweigh the evidence and set aside a jury verdict merely because the judges feel that a different result is more reasonable." *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 634 (Tex. 1986) (quoting *Dyson v. Olin Corp.,* 692 S.W.2d 456, 458 (Tex.1985) (Robertson concurring)).

Again, the evidence is clear that appellant had knowledge that Blount was a general contractor, and that Blount used the funds in account 001–909 to pay its sub-contractors and materialmen. Appellant specifically had

knowledge that Blount would receive money from certain jobs, deposit that money into account 001–909, and thereafter pay its sub-contractors and materialmen monies owed them for work done on jobs by use of checks drawn on account 001–909. Having this knowledge, appellant put a "hold" on account 001–909 on December 18, 1989, and refused to honor any checks drawn on that account. Furthermore, even after specific written notice of the trust nature of account 001–909, on March 6, 1990, appellant applied all remaining funds to a debt allegedly owed appellant by Blount.

From December 18, 1989, (date of "hold") through March 6, 1990, (date of "off set") appellant had actual knowledge that Blount's sub-contractors and materialmen had not been paid money owed them by Blount. Appellant reviewed each and every transaction relating to account 001–909. Deon Thornton, now President of appellant's Bank, testified as follows:

Q Well, I'm going to get to that. My question is at this point and time is, when you put the hold on the account, didn't the bank review each and every transaction that was presented to it and determine whether it was going to pay it or not?

A Yes.

We conclude that the evidence is sufficient to show that prior to appellant's seizing the funds in account 001–909, appellant had specific knowledge of the trust nature of the account and that the funds should have been released to the unpaid sub-contractors on the Provost–Sheldon job. We hold that there is probative evidence, sufficient in nature to support the jury's answer to Jury Question No. 1.

Points of error three and four contend that there is "no evidence" or "insufficient evidence" to support the jury's finding on Jury Question No. 2.

■ A constructive trust will be imposed as a remedial measure, and is often used in redressing wrongs or unjust enrichment caused when one person wrongfully takes the property of another. *See Mims v. Beall*, 810 S.W.2d 876, 881 (Tex.App.—Texarkana 1991,

no writ); *Matter of Estate of Crawford*, 795 S.W.2d 835, 841 (Tex.App.—Amarillo 1990, no writ).

The trial court instructed the jury that a constructive trust arises when a person holding property would profit from a wrong or would be unjustly enriched if permitted to keep the property. The evidence of appellant's knowledge that third party's claimed rights to funds in account 001–909 sufficiently established that appellant's seizure of those funds was a wrongful act for which appellant would be unjustly enriched if allowed to keep the money.

Appellant's contention, that it did not become a trustee for these funds since it had no knowledge that the funds were for the benefit of sub-contractors and thus no legal obligation, is not supported by the evidence in this case. To agree with appellant would require us to disregard preponderating evidence. Points of error three and four are overruled.

■ Appellant's points of error five and six also contend that there is "no evidence" or "insufficient evidence" to support the jury's answer to Jury Question No. 3. As previously stated, Jury Question No. 3 inquires as to the willful, malicious or gross negligent acts of appellant. When a bank has knowledge that an account contains funds which are trust-like in nature, the bank has an affirmative duty to separate those trust-like funds from those that belong to the depositor before applying any funds to a debt of the depositor. *See Steere v. Stockyards National Bank*, 113 Tex. 387, 256 S.W. 586, 591 (1923); *Security State Bank*, 752 S.W.2d at 665. Furthermore, if a bank has knowledge that a particular account contains money held in a trust-like manner, a duty is imposed upon the bank to ascertain exactly what part of such account consists of trust-funds before the bank applies any of the funds to the debt of the depositor. *Steere*, 256 S.W.2d at 591.

■ Appellant contends that exemplary damages are not allowed for breach of an ordinary contract or for ordinary conversion of property, citing *Woodard v. Tatum*, 277 S.W.2d 943, 945 (Tex.Civ.App.—Waco 1955,

no writ). Appellant is correct in its assertion that punitive damages may not be awarded where it appears the defendant acted in good faith belief that he was exercising some right, and the mere fact that appellant withheld the converted property from appellees will not support an award of punitive damages. *See Kilgore Federal Sav. & Loan v. Donnelly,* 624 S.W.2d 933, 938 (Tex.App.—Tyler 1981, writ ref'd n.r.e.).

Under the facts of the present case we believe that appellant's citing of *Woodard* and *Donnelly* is more to appellant's peril than its defense. *Woodard* specifically holds that, "However, the breach of a contract or the taking or conversion of property may be accompanied by such wilful acts of violence, malicious or oppressive conduct as would subject the wrongdoer to exemplary damages." 277 S.W.2d at 945. Citing *National Finance Co. v. Abernathy,* 66 S.W.2d 358, 359 (Tex.Civ.App.—Beaumont 1993, writ dism'd); *Puckett v. Patton,* 16 S.W.2d 856 (Tex.Civ.App.—Fort Worth 1929, no writ).

▮ In our case the jury affirmatively found that the unlawful act, i.e., the conversion of the funds from account 001–909 was done willfully, maliciously or with gross negligence. Exemplary damages have long been recoverable for conversion accompanied by fraud or oppression, or by willfulness and malice. *Craddock v. Goodwin,* 54 Tex. 578 (1881); *Gordon v. Jones,* 27 Tex. 620 (1864); *Cole v. Tucker,* 6 Tex. 266 (1851). We find the evidence, discussed in the general exposition of the facts and reiterated below, supports a finding that appellant's actions were willful and malicious, without regard to whether appellant's actions reflect actual conscious indifference and created an extreme degree of risk. Since we may uphold the jury's finding on a ground other than gross negligence, a review of the evidence of gross negligence is unnecessary. *Compare, Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10 (1994); *Burk Royalty Co. v. Walls,* 616 S.W.2d 911 (Tex.1981).

▮ Appellant does not challenge the amount of punitive damages, but confines its assignment of error to an argument that there is legally insufficient, or alternatively factually insufficient, evidence of willful, mali-

cious or grossly negligent conduct. Thus, we are not truly called upon to perform a review of the reasonableness of the award. *Ellis County State Bank v. Keever,* 37 Tex.Sup. Ct.J. 1117, 1994 WL 278170 (June 22, 1994); *Alamo National Bank v. Kraus,* 616 S.W.2d 908 (Tex.1981). Even though appellant has waived any and all error relating to the excessiveness of punitive damages awarded, we shall address same as an alternative to our position that "excessiveness" of punitive damages is not before this Court.

▮ Our caution emanates from recent developments set forth in *Moriel,* which require appellate courts to not only apply these guiding factors set forth in *Kraus,* but to definitively articulate an application of the evidence to the factors.

*Kraus* requires an evidentiary review of the following five considerations:

(1) The nature of the wrong;

(2) the character of the conduct involved;

(3) the degree of culpability of the wrongdoer;

(4) the situation and sensibilities of the parties concerned; and

(5) the extent to which such conduct offends a public sense of justice and propriety.

We now apply the evidence to these elements.

### *Kraus* Factors 1 and 2

▮ The first and second *Kraus* factors to be considered by a reviewing court are "the nature of the wrong" and "the character of the conduct involved." *Kraus,* 616 S.W.2d at 910. Question No. 1 asked the jury: "Do you find from a preponderance of the evidence that [Appellant] converted funds from Blount Construction, Inc.'s account number 001–909?" A proper instruction on the meaning of "conversion" followed Question No. 1, informing the jury that "conversion" means that a bank knew, or should have known that funds it applied to reduce a debt owed to the bank were held for the benefit of someone other than the depositor. Therefore, under *Moriel* and *Keever* analyses, there must be specific evidence which sup-

ports the "nature of the wrong" (conversion), and evidence which supports the "character of the conduct involved" (the fact the Appellant acted with knowledge).

There is evidence in the trial record that Appellant had specific knowledge that the funds in Account 001–909 were held for the benefit of parties other than the depositor. There is evidence that Appellant had specific knowledge that the funds held in the account in question were used to pay subcontractors and materialmen money owed them by the owner of the account, using checks drawn on the account. An officer of Appellant testified on direct examination that she knew that Account 001–909 was used for that purpose. There is also evidence that prior to applying all of the funds remaining in Account 001–909 to a debt allegedly owed Appellant by the owner of the account, Appellant reviewed each and every transaction relevant to the account, and determined which checks from the account would be paid and which ones would not. Moreover, there is evidence that, at the time it actually applied the funds in the account to the debt allegedly owed to it by the account holder, Appellant knew that the account owner's subcontractors and materialmen had not been paid money owed to them by the account owner.

The "nature of the wrong" found by the jury was conversion of funds held in Account 001–909 by Appellant. The "character of the conduct" of Appellant involved was seizing the funds in the account with the knowledge that parties other than the depositor had rights to those funds. Therefore, there is specific evidence to which this Court may refer supporting these first two *Kraus* factors.

### Kraus Factor 3

■ The third *Kraus* factor relates to the "degree of culpability of the wrongdoer." Jury Question No. 3 inquired: Do you find from a preponderance of the evidence that defendant acted willfully, maliciously or with gross negligence when [defendant] set off or removed the funds ...?" Proper instructions regarding the definitions of "willfully and maliciously" and "gross negligence" followed the question.

In addition to the evidence supporting the jury's finding of knowledge on behalf of Appellant, there is evidence that Appellant acted with wanton disregard for the rights of Appellee as well. Although Appellant had an affirmative duty under Texas law to separate funds which it knew were trust-like in nature prior to applying the funds to the alleged debt, there is evidence that Appellant neglected that duty. An officer of Appellant testified that no attempt was ever made to segregate the funds in the account, in spite of Appellant's knowledge that some of the funds were held for the benefit of third parties. Furthermore, Appellant received written notice on or about January 8, 1990, that the funds held in Account 001–909 were being held by the account owner for the benefit of its subcontractors, that funds in the account represented payment to the account owner for the job on which the subcontractors performed work for the account holder, and that the funds were in the nature of a trust in favor of those subcontractors. In spite of this specific notification, Appellant chose to disregard the rights asserted by the subcontractors, and proceeded to convert the funds, with full knowledge that others were asserting claims to the funds. Finally, there is evidence that Appellant proceeded with the conversion of the funds in Account 001–909 even after it had been sued.

The evidence described in the foregoing paragraph related to the degree of culpability of Appellant. Based on that evidence, the jury found that Appellant acted with malice or gross negligence by knowingly disregarding the rights asserted by the subcontractors. Therefore, the jury's finding of willful, malicious or grossly negligent actions by Appellant should be upheld, even under the standards set forth in *Moriel* and *Keever*.

### Kraus Factors 4 and 5

■ The fourth and fifth *Kraus* factors are more general in nature, and relate to "the situation and sensibilities of the parties concerned" and "the extent to which the conduct offends the public sense of justice and propriety." *Kraus*, 616 S.W.2d at 910. Much of the same evidence detailed above

relates to these final two *Kraus* factors as well.

The evidence regarding Appellant's knowledge of the trust-like nature of the funds in Account 001–909, as well the evidence of Appellant's deliberate violation of its affirmative duty to separate the funds is relevant to the "sensibilities", or perceptions of the parties at the time the actions complained of occurred. The evidence detailed above demonstrates that Appellant was in a situation whereby it could have avoided violating the rights of Appellees, but made a conscious decision to proceed with the seizure of the funds. At the time of this seizure, the evidence shows that Appellant perceived that the funds in Account 001–909 were used by the depositor to pay subcontractors, that funds held in the account represented proceeds from a job on which the subcontractors had performed services for the depositor, and that despite the foregoing knowledge, Appellant did not take steps to determine which of the funds in Account 001–909 belonged to the depositor, and which of the funds may belong to the subcontractors.

Not only does the foregoing evidence relate to the "situations and sensibilities of the parties concerned," it also shows "the extent to which Appellant's conduct offends the public sense of justice and propriety." The evidence described above which shows that Appellant knowingly and wantonly disregarded the rights of others caused the jury to award damages which would serve as "an example to others and as a penalty or ... punishment" to Appellant.

## COMBINING ALL *KRAUS* FACTORS

Appellant contends that it was engaged in the "sincere pursuance of a claimed legal right," and that it was acting in good faith and that evidence of its failure to make further inquiries does not support an award of exemplary damages.

■ Once the jury determined that Mauriceville National Bank knew, or should have known, of the trust nature of the account, the jury could, and apparently did, reject appellant's contention that its actions were reasonable. *See Allied Bank West Loop*, 728 S.W.2d at 58. Viewing the evidence objectively, we find: The Bank recognized at least some duty or obligation to place a telephone call to Mr. Blount, on December 15, 1989, to obtain consent to debit account 001–909 for past due interest on the Blount note; the Bank knew that sub-contractors were attempting to have their checks honored through account 001–909; the Bank, for whatever reason, made no effort to memorialize its contact with sub-contractors; the Bank, knowing that sub-contractors were attempting to have checks honored, rigidly maintained its "hold" on account 001–909; and, even after written notice of the trust-like nature of account 001–909, the Bank, on March 6, 1990, chose to unilaterally "Razoo" [1] the balance of account 001–909. We believe the best evidence of appellant's willful and wanton disregard of the trust-like nature of account 001–909 is shown by appellant's complete disregard of the January 2, 1990, written notice regarding the account. Again, in spite of that notice, on March 6, 1990, appellant applied the remaining balance of account 001–909 to the indebtedness owed by Blount

1. "Razoo" is a "real" word meaning: with influence of *razzle-dazzle* ... WEBSTER'S NEW INTERNATIONAL DICTIONARY 2069 (2nd ed. 1936).

"Razoo" was also used colloquially, meaning, "grab all you can, as quick as you can." The word was commonly used by marble playing youngsters in the 1940's and 50's. During this era, playing the game of marbles "for keeps" was morally unacceptable, for such constituted a form of gambling or gaming. To be caught playing marbles "for keeps" on school campus, subjected the catchee or catchees to corporal punishment. Nevertheless, certain youngsters, from time to time, would run the risk of punishment by indulging in this morally improper activity. In so doing, a virtually fail-safe warning system was devised. One or more youngsters were designated "lookouts," whose sole function was to sound the alert should a teacher or principal approach the area. Rather than yelling, "the teacher/principal is coming," the "lookout" would simply yell, "Razoo" thus, was born the "Razoo Rule." The word "Razoo," immediately triggered an unwritten legal concept known as "absolute and unquestioned ownership" of all the marbles which could be grabbed by any of the players. The fairness of the "Razoo Rule" was derived from the fact that all players "agreed" to the rule. (Whether the "Razoo Rule" was recognized nationally, the writer knoweth not, however, the rule was of common understanding at Pine Grove Elementary School, Newton County, Texas).

to appellant. Taking into account all of the evidence in support of the jury's verdict, applying that evidence to those factors required in *Kraus,* we hold that the award of $200,000 punitive damages not to be legally excessive.

■ Appellee contends that *Moriel* is prospective and does not apply to those cases preceding its effective date. In this regard, we quote a portion of Justice Raul Gonzalez' majority opinion in *Ellis County State Bank v. Keever,* 37 Tex.Sup.Ct.J. at 1124:

> Although *Moriel* was decided after the court of appeals' decision in this case, its holding should be applied to a pending case in which a party has preserved the complaint that the court of appeals failed to properly scrutinize a punitive damage award.

In cases where punitive damages have been awarded, the new focus for reviewing courts is upon ensuring that such awards, "are not grossly out of proportion to the severity of the offense and have some understandable relationship to compensatory damages." *Moriel* at 28, quoting *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 22, 111 S.Ct. 1032, 1045, 113 L.Ed.2d 1 (1991).

In light of the fact that the present appeal was pending before this Court when *Moriel* was issued, we believe appellee misconstrues the "future" effect of *Moriel.*

We overrule appellant's points of error five and six for alternative reasons. First, these points of error are overruled for appellant's failure to properly raise by point of error, the question of whether the punitive damages awarded in this case were excessive. Secondly, and alternatively, we overrule points of error five and six for reason that the evidence in the record before us clearly meets the test and requirements as mandated by *Kraus, Keever,* and *Moriel.*

Having overruled all of appellant's points of error the judgment of the trial court is in all things affirmed.

AFFIRMED.